UNITED STATES of America,
Appellee,

v.

Anthony TORRES and Roberto
Rivera, Appellants.

Nos. 751, 1084, Dockets 74–2303,
75–1167.

United States Court of Appeals,
Second Circuit.

Argued June 5, 1975.

Decided July 2, 1975.

Certiorari Denied Dec. 8, 1975.
See 96 S.Ct. 457.

Albert J. Krieger, New York City (Joseph Beeler, Miami Beach, Fla., of counsel), for appellant Torres.

Alan Drezin, Brooklyn, N. Y., for appellant Rivera.

Bancroft Littlefield, Jr., Asst. U. S. Atty. (Paul J. Curran, U. S. Atty. for the Southern District of New York, Lawrence S. Feld, Asst. U. S. Atty., of counsel), for appellee.

Before SMITH, ANDERSON and OAKES, *Circuit Judges*.

J. JOSEPH SMITH, *Circuit Judge:*

On May 8, 1974, a seven-count indictment charging fourteen defendants with conspiracy to import, sell, distribute and possess with intent to distribute large amounts of heroin and cocaine and with various substantive offenses relating to trafficking in those drugs was filed in the United States District Court for the Southern District of New York. One defendant's motion for a severance was granted, one entered a plea of guilty, one died and nine are fugitives. The remaining two—Anthony Torres and Roberto Rivera—were found guilty by a jury of all charges leveled against them,[1] and the court, John M. Cannella, *Judge,* entered judgment.[2] Both have appealed, attacking the sufficiency of the evidence as well as the conduct of the trial. Finding no merit in any of their contentions, we affirm.

## I. THE FACTS

It is sufficient at the outset to give a brief description of the manner in which the conspiracy operated; additional facts

---

1. Count one named both defendants as participants in a conspiracy originating in July, 1970, and continuing up to the date of the indictment. 21 U.S.C. §§ 173, 174, 846, 953. In addition, Torres was charged in count two with concealing and facilitating the transportation of twenty kilos of illegally imported cocaine in January, 1971, 18 U.S.C. § 2, 21 U.S.C. §§ 173, 174, and in count three with distribution and possession of ten kilos of cocaine with intent to distribute in May, 1971, 18 U.S.C. § 2, 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A). Rivera was charged in count four with distribution and possession of two kilos of cocaine with intent to distribute, also in May, 1971, 18 U.S.C. § 2, 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A). Sections 173 and 174 of Title 21 were repealed effective May 1, 1971, and apply to acts committed prior to

that date; the other cited sections of Title 21 became operative on May 1, 1971, and apply to acts committed thereafter. See Pub.L. 91–513, §§ 704, 1105(a) (1970).

2. Both defendants are prior offenders. Torres was sentenced to concurrent terms of fifteen years imprisonment on counts one and three and twenty years on count two, to be followed by a five-year special parole term, was fined $25,000 on each of counts one and three and $20,000 on count two, and was assessed the cost of the prosecution. Rivera was sentenced to concurrent terms of fifteen years imprisonment on counts one and four, to be followed by a special parole term of three years, was fined $25,000 on each count, and was assessed the cost of the prosecution.

relevant to particular points raised on appeal will be developed as the need arises. In a nutshell, the government's evidence showed an international drug smuggling ring with a pipeline from Argentina to New York, and established Torres' and Rivera's roles as buyers at the New York end.

In approximately April of 1970 Yolanda Sarmiento, Alfredo Mazza and Wladimir Bandera[3] met in Buenos Aires and agreed to set up a smuggling operation. Mazza, along with Juan Carlos Franco (also known as Miguel Aspilche and referred to hereafter as Miguel),[4] went to New York, met with a painter named Rodolfo Ruiz,[5] and hatched a plan to ship drugs to Ruiz in New York concealed in the false backs of antique picture frames. Two shipments were made in this manner in October and December of 1970. In each instance Mazza went to New York, received the drugs after their removal from the frames, and sold them. A third shipment was completed in January, 1971, but this time Miguel went to New York because Mazza was vacationing in Uruguay.[6] Mazza, upon his return from vacation, accompanied shipment number four to New York in April, 1971.

Miguel, meanwhile, had become disenchanted with his percentage of the "take" from Sarmiento's operation. He convinced Bandera to provide some narcotics directly to him and, using the same picture frame scheme, made two shipments of his own to New York in May and July of 1971.[7] Miguel accompanied both shipments to New York himself and arranged for their sales.

Another shipment was made by Sarmiento and Mazza in September, 1971.

It turned out to be their last, however, since customs agents in New York intercepted the frames, discovered the narcotics, and made a controlled delivery of the frames to Ruiz. His arrest as he took possession put an end to the scheme. In all, the picture frame device was used to smuggle approximately 154 kilos—almost 340 pounds—of drugs into New York.[8]

## II. SUFFICIENCY OF THE EVIDENCE

Rivera makes two claims that the evidence was insufficient. First, he challenges the admission into evidence against him of hearsay declarations of co-conspirators, contending that the non-hearsay evidence of his membership in the conspiracy was insufficient to meet the requirement of *United States* v. *Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), that before the trial court can permit the jury to consider hearsay evidence against a particular defendant it must determine that

> the prosecution has proved participation in the conspiracy, by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence independent of the hearsay utterances.

His second argument is that there was insufficient evidence on the substantive count.

■ The non-hearsay evidence of Rivera's participation in the conspiracy was sufficient under *Geaney*. The government established the dates for the January, 1971, shipment of picture frames by documentary evidence. Lorenzo Cancio, an unindicted co-conspirator, testified

---

**3.** Sarmiento was named as a defendant in the conspiracy count and remains a fugitive. Mazza, named as an unindicted co-conspirator, testified for the government. Bandera was charged as a conspirator, entered a guilty plea, and testified for the government.

**4.** Miguel was named as a defendant in all seven counts. He remains a fugitive.

**5.** Ruiz was named as an unindicted co-conspirator.

**6.** This shipment formed the basis for count two.

**7.** The May shipment formed the basis for counts three and four.

**8.** Sarmiento shipped 56 kilos of cocaine and 28 of heroin; Miguel's two independent shipments consisted of 45 kilos of cocaine and 25 of heroin.

that during that month, while he was in a bar with Enrique Lopez, a contact man for drugs,[9] Rivera and Miguel entered and approached them and went off to the rear of the bar with Lopez for a private discussion. When they returned, Rivera asked Cancio to accompany him to his bar in the Bronx because he wanted protection for some money he was carrying. Cancio went along, and on the way Rivera told him that if he wanted to make some money he should establish a relationship with Miguel, because Miguel was "the connection."

■ Again by documentary evidence the government established the dates of the May, 1971, shipment; moreover, Bandera testified that he actually packed the drugs for that shipment in the picture frames. Cancio testified that on or about May 20 he and Miguel went to Rivera's bar where Rivera gave Miguel a large paper bag filled with money. Miguel made some computations in a small book and told Rivera that he still owed $16,000, but that Cancio would have to collect it since Miguel was going out of town. Rivera replied "all right."[10] The next day Cancio returned to Rivera's bar and picked up the $16,000.

■ The combination of these two incidents is sufficient, under the test of *Geaney*, to establish that Rivera was aware of the scheme and participated in it. The January conversation alone might have been deficient, since membership in a conspiracy is not established by evidence of mere association with conspirators, *United States* v. *Cirillo*, 499 F.2d 872, 884–85 (2d Cir. 1974), *cert. denied*, 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974), or by the fact that a defendant told a willing buyer how to make contact with a willing seller, *United*

*States* v. *Hysohion*, 448 F.2d 343, 347 (2d Cir. 1971). Similarly the May transaction alone may not have been enough since participation in one isolated purchase of drugs does not, by itself, imply sufficient awareness of a wide-ranging conspiracy to qualify the buyer as a member thereof. *United States* v. *Sperling*, 506 F.2d 1323, 1342 (2d Cir. 1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975). Here, however, Rivera's demonstrated awareness of a conspiracy's existence coupled with his active participation more than adequately establishes his status as a conspirator. We reject his contention that the transfer of money to Miguel could just as easily have been in payment for something other than drugs. Rivera knew that Miguel was "the connection" and the payment was made while Miguel was in New York at the same time the drug shipment arrived. The inference that the payment was drug-related, while certainly not compelled, is strong enough. *See United States* v. *Tramunti*, 513 F.2d 1087, 1108–09 (2d Cir. 1975).

■ Once the hearsay evidence was admitted, the evidence that Rivera was a buyer of drugs from Miguel was substantial.[11] This additional evidence adds weight to the inference that the May payment was for drugs, and tends to belie Rivera's claim that the evidence on the substantive count (distribution and possession with intent to distribute in May, 1971) was insufficient. That Miguel was in New York selling drugs in May, and that Rivera, one of his regular buyers, made a substantial payment to him at that time, cannot seriously be contested. That the jury could have found that the payment was for drugs is also beyond genuine dispute. There is, however, no direct evidence that Rivera actually handled drugs in May or that

9. Lopez, named as a defendant in all counts, died prior to trial.

10. Rivera's response—itself not hearsay, but rather an admission—takes the reported statement of Miguel out of the hearsay category and gives it the status of an adoptive admis-

sion. *See, United States* v. *Fantuzzi*, 463 F.2d 683, 690 (2d Cir. 1972).

11. Cancio testified that Lopez identified Rivera to him as one of Miguel's buyers, and that Lopez got a commission on each kilo that Rivera bought from Miguel.

the May payment was for drugs from the May shipment. Rivera's only possible argument, therefore, is that, although the government established that he bought drugs, it did not establish that the May payment was for the May shipment. But in view of the temporal coincidence and the fact that Rivera was identified as a regular buyer we hold that the evidence was sufficient for the jury to make the inference.

## III. THE REDONDO TESTIMONY

The government's initial witness was one Juan Redondo-Pedrazas, who testified regarding narcotics dealing by Sarmiento in New York in 1969 and 1970, prior to her arrest and flight to Argentina, and prior to the commencement of the conspiracy as alleged in the indictment. Redondo identified Torres and Rivera as among Sarmiento's buyers at that time. Both defendants claim that the admission of this testimony was reversible error since it inculpated them in crimes other than those for which they were being tried.

■■■■ The district court admitted the evidence on the issue of mental operation and intent, but it had nothing to do with that issue. However, defendants are mistaken when they claim that evidence of other crimes is admissible only on rebuttal and even then only if properly slotted within one of the traditional exceptions to the rule excluding such evidence on the "bad man" theory. The law is rather that other crimes evidence is admissible on the government's case in chief unless introduced *solely* to show the defendant's criminal character, provided that its probative worth outweighs its potential prejudice. *United States* v. *Papadakis,* 510 F.2d 287, 294 (2d Cir. 1975), *cert. denied,* 421 U.S. 950, 95

S.Ct. 1682, 44 L.Ed.2d 104 (1975). Where the evidence is used by the government to show the background and development of a conspiracy, it is not introduced solely to show criminal character. *Id.,* 510 F.2d 287 at 294–95; *United States* v. *Colasurdo,* 453 F.2d 585, 591 & n. 3 (2d Cir. 1971), *cert. denied,* 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972). That was the function of the evidence here, and reversible error did not occur when the district court premised its ruling on an inapplicable theory.[12]

## IV. MISCELLANEOUS CLAIMS

■■ 1. On the second day of the trial one juror and both alternates saw the defendants in handcuffs in the corridor outside the courtroom. The district court questioned the jurors on *voir dire;* one alternate said that this view might affect her judgment, and she was excused, but the others who said that their decisions would not be influenced were retained. Both defendants claim that their rights to a fair trial were thereby irredeemably infringed. We disagree. Although it "ignores reality" to say that there can be no prejudice from an incident such as this, *Kennedy* v. *Cardwell,* 487 F.2d 101, 109 (6th Cir. 1973), *cert. denied,* 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974), it is also the case that the prejudice will invariably be less than in situations where the defendant has been shackled in court throughout the trial. *Id.* In this case, however, the trial court's expeditious handling of the matter certainly minimized whatever prejudice there may have been. Since the incident was not flagrantly prejudicial, and since there was no specific showing of how the defendants were harmed,[13] we are inclined to give full

---

**12.** Although the defendants objected to the introduction of Redondo's testimony, they did not except to the district court's instruction charging the jury that this testimony was to be limited to mental operation and intent. Considering that the court also told the jury that they could "almost forget about" Redondo's testimony since it "has got nothing to do with this case whatsoever," Tr. 1741–42, it is easy

to see why no exception was taken to this portion of the charge, and difficult to give credence to defendants' claims that this testimony prejudiced them.

**13.** Torres' contention that New York jurors would surely be aware of the provisions of the Bail Reform Act making release on bail dependent on factors other than wealth, 18

effect to the jurors' statements of impartiality on *voir dire*. *See, Murphy* v. *Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). In light of those statements, we cannot say that there was either a deprivation of constitutional rights or a degree of unfairness sufficient to invoke a reversal under our supervisory powers.[14]

 2. Rivera claims that the government's proof demonstrated the existence of multiple conspiracies. While there certainly was a solid basis for arguing that a separate conspiracy arose when Miguel began shipping drugs independently from Sarmiento, and perhaps even in competition with her, this is an issue of fact that was argued strongly to the jurors and rejected by them; we will not upset their determination. *United States* v. *Crosby*, 294 F.2d 928, 945 (2d Cir. 1961), *cert. denied*, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962). Moreover, although he argues vaguely about "spillover effect," Rivera has not demonstrated how he was prejudiced under *United States* v. *Agueci*, 310 F.2d 817, 827 (2d Cir. 1962), *cert. denied*, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963).

3. Taken in context, neither the remarks of the trial court nor the summation by the government could have prejudiced the defendants to any significant degree. *United States* v. *Ramos*, 268 F.2d 878, 880 (2d Cir. 1959).

The alleged errors, whether viewed individually or in the aggregate, did not deprive defendants of their right to a fair trial. Accordingly, we affirm the judgments of conviction.

Affirmed.

U.S.C. § 3146(b), and that therefore they would somehow be influenced by the fact that defendants were not released on bail, is absurd.

14. *United States* v. *Crane*, 499 F.2d 1385, 1388–89 (6th Cir. 1974); *Kennedy* v. *Cardwell*, 487 F.2d 101 (6th Cir. 1973), *cert. denied*, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974); *United States* v. *Sperling*, 362 F.Supp. 909, 913 (S.D.N.Y.1973), *affirmed*, 506 F.2d 1323, 1343 n. 30 (2d Cir. 1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975). *Marshall* v. *United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), cited by Torres, is inapposite. There the Court, exercising its supervisory powers, *see Murphy* v. *Florida*, 421 U.S. 794, 797, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), ordered a new trial where the jurors had seen newspaper articles describing how the defendant in a prosecution for unlicensed dispensing of drugs had previously been convicted of practicing medicine without a license. The decision rested on the fact that the prosecution had tried to introduce that very evidence on the question of entrapment, and the trial court excluded it on the ground that it would have been too prejudicial. Here, however, the jury was not exposed to evidence that had already been excluded on grounds of prejudice.