**UNITED STATES of America, Appellee,**

v.

**Louis R. WOLFISH, Defendant-Appellant.**

**No. 1167, Docket 75–1138.**

United States Court of Appeals, Second Circuit.

Argued June 23, 1975.

Decided Aug. 14, 1975.

Certiorari Denied Jan. 12, 1976. See 96 S.Ct. 794.

458

Steven A. Schatten, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., Southern District of New York, Allen R. Bentley, Angus Macbeth, John C. Sabetta, Asst. U. S. Attys., of counsel), for appellee.

Stanley H. Fischer, New York City, for defendant-appellant.

Before CLARK, Associate Justice,* and MANSFIELD and MULLIGAN, Circuit Judges.

PER CURIAM:

Louis R. Wolfish appeals his jury conviction on three counts of devising a scheme to defraud the Bankers Security Life Insurance Society out of approximately $200,000 in life insurance proceeds through the use of the mails in violation of 18 U.S.C. § 1341. He was sentenced concurrently to three terms of three and one half years and made eligible for parole in one year under 18 U.S.C. § 4208(a)(1). We affirm.

* United States Supreme Court, Retired, sitting by designation.

Although an extended narrative of appellant's dabbling in fraud might prove interesting to devotees of crime fiction, the briefest of backgrounds will suffice for judicial purposes. This opinion has already been made lengthy enough by the necessity of dealing with the long list of wholly frivolous issues raised by appellant. The gist of the offense is that in the fall of 1971, a forged death certificate which purported to show that Wolfish had died in Jerusalem on January 7, 1971, was fraudulently submitted to Bankers Life. Wolfish is an ordained rabbi who once practiced law in the United States. After having been disbarred in 1969, he moved to Israel with his wife, Marcia, and their children but, throughout the years 1971 and 1972, frequently travelled back to the States.

On two occasions in January of 1971, appellant—without identifying himself—visited the Israeli consulate in New York City to have translations of Israeli death certificates authenticated. On the first occasion, he brought with him copies of a forged certificate of his own death and obtained an authentication of the accuracy of the translation; on the second occasion, he brought the original of a genuine certificate of his mother's death on August 11, 1970, in Jerusalem, and on that occasion, in addition to an authentication of the translation, obtained an official stamp which implied the legal validity of the contents of that document. Subsequently, Wolfish substituted the forged certificate for the genuine document and had an Israeli notary produce nine copies of the "new" death certificate. He then requested Bankers Life to send claim forms for three insurance policies on his life, and the Company did so. (Count One). He then submitted these forms, purportedly signed by his wife, with the forged certificates, seeking the proceeds of the policies.

In December of 1971, Bankers Life mailed a check for approximately $180,000 on two of the policies directly to Mrs. Wolfish at an address in the United States. (Count Two). A separate check on the third policy for $20,000 was sent in January of 1972 to their local agent for hand delivery (Count Three), and this proved the undoing of appellant. When no Marcia Wolfish was found at the address on the claim forms, an investigation was begun which led to the discovery of the forgeries. Contacts between United States law enforcement agents and Israeli authorities, in turn, led to a search of Wolfish's Jerusalem apartment on August 9, 1972, and the seizure of several documents by Israeli police including copies of Wolfish's death certificate, the original of his handwritten death certificate, the death certificate of Wolfish's mother which had been tampered with, and two boxes of red notarial seals.

Following the search of his apartment, Wolfish left Israel and was a fugitive until February 14, 1974 when he surrendered. It was learned at trial that sometime during the summer of 1973, he became the rabbi of a synagogue in Passaic, New Jersey, using the name Haim Whale. Testimony at trial showed that the Jewish form of appellant's last name is Leviathan which is translated into English as "whale"; and the Hebrew translation of "Louis R." is "Eliezer Haim".

I.

The first assignment of error raises objection to what appears to be an unfortunate slip of the trial judge's tongue when, in his charge to the jury, he said:

> The burden of proving guilt beyond a reasonable doubt never shifts. It remains upon the Government throughout the trial. The law never imposes upon a defendant in a criminal case the burden of calling any witnesses or producing any evidence. You may draw *no unreasonable inferences* against the defendant because he did not take the stand and testify.
>
> In addition, you may not speculate as to why the defendant chooses not to testify nor may you speculate as to what the defendant might have stated had he chosen to testify. In every criminal case, there is a Constitutional

rule which every defendant has the right to rely upon. It is the rule that no defendant is compelled to take the witness stand. It is the prosecution which must prove a defendant guilty as charged beyond a reasonable doubt. . . . The defendant is presumed to be not guilty of the accusations contained in the indictment and this presumption continues not only throughout the trial but even during your deliberations in the jury room. [Emphasis supplied]

It appears to us that the court intended to say that no "unfavorable" inferences might be drawn from the defendant's failure to take the stand. It is true that one could conclude from the sentence as delivered that the jury might draw unfavorable inferences against the defendant because of his failure to testify if "reasonable". It is manifest, however, that taken as a whole the intent of the quotation is clear, and its overall meaning was that no adverse inferences could be drawn by reason of Wolfish's failure to testify. Moreover, Wolfish's experienced trial counsel never objected during the trial and raised the point for the first time on appeal under a claim of plain error. Indeed, the slip was not discovered until the Court Reporter wrote up the transcript after the appeal had been noted.

■ The question, therefore, is whether such a slip of the tongue constitutes plain error. We recognize that an inadvertence may have as grave a consequence as any error, but have concluded that under the circumstances here—in light of the clarity of the overall language, and the overwhelming proof of guilt—the error was harmless.

## II.

■ The second claim of error relates to the sufficiency of the evidence. We find abundant evidence that Wolfish knowingly caused the mails to be used in his scheme, for the mailing by the company of the claim forms and checks actually implemented the plan and brought it to fruition. In addition, the evidence reveals that Wolfish filed change of address forms that caused their mail to be forwarded from his former home in Spring Valley, New York, to his brother-in-law's home in Astoria, New York, where he was staying during 1971 and 1972. Finally, the mails between Israel and the United States were used in obtaining translations of the forged death certificate from a notary in Jerusalem.

## III.

■ Appellant next accuses the prosecutor of making an inflammatory attack on appellant's religious calling in his summation. As noted before, Wolfish was an ordained rabbi. At one point, the prosecutor referred to Moses and one of the Ten Commandments—"Honor Thy Father and Mother". He then reminded the jury that the death certificate of Wolfish's mother had been used in the scheme and then suggested that the jury "will see the attitude toward those Ten Commandments exhibited by this Rabbi Wolfish". Defense counsel objected on the ground of prejudice and moved for a mistrial, which was denied. When seen in perspective, this appears to us to be nothing more than fair comment by the prosecutor.

Wolfish's counsel in his summation had accused the Government of "framing" its identification of Wolfish and sought to explain much of Wolfish's conduct on the basis of religious activities. For example, counsel argued that the change of Wolfish's name to Haim Whale was similar to the use of names like Sister Elizabeth by nuns "or even imagine the Pope, Pope Pius, that is not his name but that is his religious name." We find no error here. *See United States v. deAngelis*, 490 F.2d 1004, 1012 (2d Cir. 1974).

## IV.

Appellant accuses the Government of bad faith in claiming readiness for trial and then moving for the production of handwriting exemplars. Appellant tags the notice of readiness under Rules Re-

garding Prompt Disposition of Criminal Cases as false and a sham. On July 8, 1974, the Government announced that it was prepared to go to trial on July 22nd, but the trial was postponed when Judge Bauman resigned from the bench. The case was transferred to Judge Pierce who set the trial for January 6, 1975, and gave the parties until August 30, 1974, to file additional motions. On August 21st, the Government moved for handwriting exemplars and, on October 3, 1974, they were furnished by Wolfish without the presence of his counsel.

■ Appellant claims that this conduct by the Government violated Rule 4 of the district court's Rules Regarding Prompt Disposition of Criminal Cases. While the Rule provides that the Government must be ready within six months from the date of arrest, the postponement here was not at the instance of the Government but solely because of the resignation of Judge Bauman. This delay is not chargeable to the Government, and since the exemplars were sought in ample time before the delayed trial date, we can see no error.

## V.

■ Appellant next complains of the testimony of the Government's hand writing expert from Israel, Vadar Tamir. Mrs. Tamir gave her opinion that Wolfish had disguised his handwriting in giving court-ordered exemplars. It is now argued that this testimony changed the exemplars to a testimonial acknowledgment of guilt in violation of the Fifth Amendment. But the record fails to support Wolfish's claim. In comparing "known" and "questioned" handwriting samples, the Israeli expert had excluded the court-ordered exemplars. Defense counsel then endeavored on voir dire to establish that Wolfish's court-ordered exemplars were truly samples of his handwriting and that he was not the author of the black pencil notations on the original handwritten death certificate of Wolfish's mother which was thereafter altered to evidence the purported death

of Wolfish. We think that the Government was entitled to go into the basis for the witness' conclusion that Wolfish had disguised his handwriting in giving the exemplars.

■ In summation, defense counsel again urged the differences between the handwriting of the court-ordered exemplars and that found on the incriminating death certificate of Mrs. Wolfish that had been altered. He also attacked Mrs. Tamir's testimony by claiming that an expert could not discover whether one was disguising his handwriting. In response the Government re-read Mrs. Tamir's testimony to the jury which described Wolfish's refusal to write out complete words while providing the exemplars, and his effort to write individual Hebrew letters from bottom to top, rather than from top to bottom as is usually done. We conclude that the comment of the Government that the disguise was further evidence of guilt was justified and was not a Fifth Amendment violation. *See United States v. Stembridge*, 477 F.2d 874 (5th Cir. 1973).

■ In addition, Wolfish contends that the opinion testimony of the Government's Hebrew handwriting expert was predicated on supposedly known but unauthenticated samples. However, Mrs. Tamir's findings were based on a comparison of the altered death certificate of Wolfish's mother and samples of his known writing, including the court-ordered exemplars and Government Exhibits 45A and 45B, which are two letters addressed to appellant's wife and internally identifiable as having been written by appellant. The chain of circumstances in the evidence is so complete that there can be no doubt that Wolfish wrote the two letters beginning: "Dear Marcia & Children".

## VI.

■ Appellant next complains because the grand jury testimony of Israel Horowitz, his brother-in-law, was admitted as substantive evidence. Horowitz had

been called by the Government but testified on cross-examination that he and his family had complete control of the mail that came to his house; that he had "access" to appellant's mail; and that at times he opened the latter's mail. On re-direct it was called to his attention that his grand jury testimony was to the contrary, but he was unable to recollect those statements. The trial court thereupon declared him to be a hostile Government witness and admitted his grand jury testimony into evidence. Moreover, defense counsel conceded at trial that the transcript being used was indeed that of Horowitz's grand jury testimony. We conclude that the trial judge's ruling was correct. *United States v. De Sisto*, 329 F.2d 929 (2d Cir. 1964).

■ Nor is there merit to appellant's claim that Horowitz invoked his Fifth Amendment rights as to this subject. Horowitz answered the questions in his testimony, and no cautionary instruction to the jury was necessary, even if it had been requested.

### VII.

■ Wolfish next complains of his courtroom identification by Eva Bahrav, the clerk in charge of the notarization desk at the Israeli Consulate in New York City. He argues that it was improper because it was the product of an earlier impermissible and suggestive photographic display. It seems that Mrs. Bahrav had been shown a photo spread of six or seven men, only one of whom was wearing a beard; that man was Wolfish. He was clean-shaven in court. The current test is whether the photographs shown Mrs. Bahrav were so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). The appar-

ent suggestiveness is lessened by Mrs. Bahrav's testimony at the trial that she did not think that in 1971 Wolfish had a beard. It appears to be as the Government asserts, that Mrs. Bahrav's identification was not predicated on the spread of pictures but rather on her three face-to-face encounters with reference to the death certificates at the Israeli Consulate in January of 1971. She stated that she had seen him for some ten minutes on each occasion on January 5th, 12th, and 13th, 1971, and that she sat directly opposite him at a desk in a well-lighted room. She was able to describe his weight, color of hair, height and other features accurately. She in fact remembered the details of his conversation since his request for death certificate translations was "very unusual". In short, Mrs. Bahrav had ample opportunity to observe Wolfish, and her courtroom identification derived not from the photograph, but from the independent basis of her face-to-face meetings and conversations. Moreover, there is significance in the fact that the very same certification which Mrs. Bahrav had attached to Wolfish's documents was subsequently found in the search of Wolfish's residence in Jerusalem.

### VIII.

■ Appellant next claims that he was denied counsel of his own choosing, i. e. Roy Cohn. The record, however, indicates clearly that from the day of his surrender through the trial, appellant was represented by Michael Rosen, rather than by Roy Cohn, Mr. Rosen's partner. Indeed, Mr. Rosen had appeared for Wolfish at all of the pretrial conferences and at none of them was any question raised as to Mr. Cohn, who filed an affidavit denying that he represented Wolfish.[1]

■ Nor did the trial court err in refusing to permit Wolfish to participate

---

1. Wolfish *pro se* sought a mandamus in this court to require the district court to hold a hearing on a defense counsel motion to be relieved of representation; to fix counsel fees, etc. The petition was denied. *Wolfish v. Pierce*, No. 74–2695 (2d Cir., filed December 30, 1974).

as co-counsel in his case. Wolfish had an experienced counsel and, so long as he retained him, he could not appear *pro se.* If he wished to handle the case *pro se,* Wolfish should have discharged his retained counsel. This he did not do and, therefore, may not now be heard to complain of any deprivation of Sixth Amendment rights. As was said in *Legal Aid Society v. Herlands,* 399 F.2d 343, 347 (2d Cir. 1968), a client has "responsibilities * * * not to invade counsel's sphere—responsibilities that rest equally on a client who is himself a lawyer even though he may find it harder to observe them * * *."[2]

## IX.

■ Wolfish next claims error in the refusal of the trial judge to turn over to him Court Exhibit 4, pertaining to a minor government witness, a state department foreign officer who testified as to Wolfish's entrances and departures into and from Israel as shown by his passport. This exhibit and several other documents were furnished to the court but not to Wolfish, and the court refused to furnish them to defense counsel on a Section 3500 and *Brady* demand since they contained no material relating to the Israeli search or to contact between American and Israeli authorities. We do not find the ruling to be clearly erroneous. *See United States v. Gugliaro,* 501 F.2d 68, 72 (2d Cir. 1974).

■ Nor do we *find* error in the refusal of the trial judge to suppress the physical evidence seized by the Israeli police during the search of Wolfish's residence in Jerusalem. A hearing was held on the motion, and the following circumstances were revealed. A United States postal inspector furnished to the Israeli Consulate in New York a copy of the forged Israeli death certificate which

Wolfish had sent to Bankers Life and requested the Israeli officials to determine if Wolfish was alive and if the death certificate was legitimate. The postal inspector was later advised that Wolfish was alive, had been travelling in and out of Israel, and that the death certificate was not authentic. Later the U.S. Attorney sought to have the State Department in Jerusalem serve a Grand Jury subpoena on Wolfish, and this was done. The search was subsequently conducted by Israeli police on August 9, 1972, and does not appear to have been suggested, requested, or directed by any American official. The decision to obtain a search warrant and to conduct the search was made entirely by Israeli officials, and the results of the search were later reported to the U.S. Attorney, through diplomatic channels. The district court, in denying the motion to suppress, concluded that the search was not made at the direction of the United States and held that the fact that United States officials "triggered the interests of the Israeli government is of no import." We affirm this holding. *See United States v. Callaway,* 446 F.2d 753, 755 (3d Cir. 1971).

■ In this connection, Wolfish also complains of the trial court's refusal to adjourn the suppression hearing. This motion appears to have come too late. After the hearing had progressed all day, Wolfish, for the first time, asked that Commander Roth of the Israeli National Police and a U.S. State Department official, such as John Mallon or John Toffit, be compelled to appear and testify. Wolfish had known of these witnesses for over six months but made no effort to secure their appearance until the end of the hearing. Commander Roth was beyond the power of the court, but his appearance might have been

---

**2.** *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (filed June 30, 1975), merely holds that a defendant may proceed to trial in a state criminal case without counsel where he voluntarily and intelligently elects to do so. Indeed, in federal courts, Section 35 of the Judiciary Act of 1789, 1 Stat. 73, provides that "in all courts of the United States, the parties may plead and manage their own causes personally or by the assistance of counsel." There is nothing in *Faretta* or in any statute which suggests that a defendant may *both* have an attorney and represent himself.

obtained through diplomatic channels, had Wolfish made timely request. Nor did Wolfish indicate what he could prove by these officials. The relevancy of their testimony was highly speculative, and a trial court enjoys broad discretion in this regard. *United States v. Rosa*, 493 F.2d 1191 (2d Cir. 1974). We cannot say that the court abused its discretion in refusing the request.

### X.

In his reply brief, appellant complains for the first time of the failure of the court to order *sua sponte* an evidentiary hearing as to his competency to stand trial. The point is further argued in a Supplemental Brief for appellant. Wolfish seems to contend that the trial judge had some doubt as to his competency; however, we find no claim made, no evidence submitted, nor any statement of the trial judge that gives any substance to such a belated claim. Certainly, the remarks of the court with reference to permitting Wolfish to take part as co-counsel in his defense would not require any hearing on his competence to stand trial. Neither Wolfish nor his attorney doubted his competency and unlike the case of *Tillery v. Eyman*, 492 F.2d 1056 (9th Cir. 1974), Wolfish's deportment at trial was neither erratic nor irrational. On the contrary, it clearly displays his competency. Coming as it does at the last minute, never being raised at trial nor argued there, we find no support in the record for the contention.

Having considered at length appellant's many claims of error, we can only conclude that the judgment should be affirmed.