**UNITED STATES of America, Appellee,**

v.

**James Seeley CYPHERS and James W. Ferro, Appellants.**

Nos. 328, 329, Dockets 76–1131, 76–1160.

United States Court of Appeals, Second Circuit.

Argued Oct. 18, 1976.

Decided Feb. 8, 1977.

Rehearing En Banc Denied April 18 and June 29, 1977.

Certiorari Denied June 13, 1977. See 97 S.Ct. 2937.

Jonathan Silbermann, New York City (William J. Gallagher, The Legal Aid Society, Federal Defender Services Unit, New York City), for Ferro.

Thomas W. Evans, New York City (P. Jay Wilker and Lance Gotthoffer, New York City, of counsel), for Cyphers.

Douglas J. Kramer, Asst. U. S. Atty., Brooklyn, N. Y. (David G. Trager, U. S. Atty., for the Eastern District of New York, Bernard J. Fried, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Before SMITH, OAKES and TIMBERS, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This is an appeal by James Cyphers and James Ferro from judgments of conviction on three counts, based on two indictments, of violating 18 U.S.C. § 1341 (mail fraud) after a jury trial in the United States Dis-

trict Court for the Eastern District of New York, Thomas C. Platt, Jr., *Judge.* Both Cyphers and Ferro claim that the evidence was not sufficient to establish any violation of § 1341 and that they were denied their right to a speedy trial. Cyphers also claims that Judge Platt erred in admitting certain evidence and in denying his request that he be allowed to make the argument to the jury. Ferro also claims that his trial violates the Interstate Agreement on Detainers. We reverse on two counts as to Ferro's claim involving the Interstate Agreement on Detainers. We find some possible merit in the speedy trial claim on all counts and therefore remand for further consideration. We find no merit in the other claims.

## I.

■ Cyphers and Ferro were found guilty by a jury on three counts of using the mail to defraud airline companies by means of altered credit cards and identifications, in violation of 18 U.S.C. § 1341.[1] The essence of the government's case was that Cyphers and Ferro had a scheme for fraudulently obtaining airline tickets by using lost or altered credit cards and that they mailed airline tickets so obtained to Dr. I. Simon on or about February 3, 1973 and on or about February 26, 1973 and to Dr. Stuart Sylvan on or about February 19, 1973.

Relying on *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), Cyphers and Ferro claim that the evidence was insufficient to establish any violation of § 1341. In *Maze* the only mailings were of credit invoices by motel employees, and the Supreme Court held that Maze's use of

one Meredith's credit card to obtain goods and services at motels did not constitute a violation of § 1341, since Maze "probably would have preferred to have the [credit] invoices misplaced by the various motel personnel and never mailed at all." *Id.*, at 402, 94 S.Ct. at 649. Cyphers and Ferro claim there was no violation of § 1341 because in each case they had purchased the ticket and received payment from either Dr. Simon or Dr. Sylvan prior to mailing the ticket, and so "the mailing here bore no relation to appellants' acquisition of the fruits of their fraud" (Brief of Appellant Ferro at 20); "any fraudulent scheme would have been no less successfully consummated had the airline tickets never been delivered" (Brief for Appellant Cyphers at 25). Cyphers and Ferro also claim that there was no evidence showing that either the tickets received by Dr. Simon on February 3 or the tickets received by Dr. Sylvan were fraudulently purchased by appellants.

In *United States v. Finkelstein*, 526 F.2d 517, 526–27 (2d Cir. 1975), *cert. denied, Scardino v. United States*, 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976), we set out the elements involved in a violation of § 1341: "sufficient evidence in the record to permit a jury to infer beyond a reasonable doubt that a scheme or artifice to defraud existed, that the participants in the scheme caused the mails to be used in furtherance of that scheme, and that the defendant was a participant in the fraudulent scheme. . . . [I]rrelevant is the fact that he [the defendant] did not personally mail the count letter or directly involve himself in the transaction . . . . It is enough that he participated in the scheme and that it was foreseeable that the scheme would involve use of the mails."

1. 18 U.S.C. § 1341 provides:
   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice

   or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

Construing the evidence in the light most favorable to the government, *United States v. Barash*, 412 F.2d 26, 31 (2d Cir.), *cert. denied*, 396 U.S. 832, 90 S.Ct. 86, 24 L.Ed.2d 82 (1969), we hold that the evidence was sufficient to show that both Cyphers and Ferro committed three violations of § 1341.

Dr. Simon, a dentist, testified that he frequently traveled to Florida from Long Island and was told by George Nagin, a friend, that airline tickets for Florida could be obtained at a discount. Dr. Simon called Nagin and had him order round-trip tickets for a February 8, 1973 flight from John F. Kennedy Airport ("JFK") to West Palm Beach. After he paid Nagin, Dr. Simon received the tickets in the mail on or about February 3, 1973. This transaction was the basis of Count I of indictment 74 CR 322. Again in February, 1973 Dr. Simon needed tickets to Florida; since Nagin was in Florida, Dr. Simon went to Nagin's Manhattan office to pick up the tickets ordered through Nagin's business associate. At Nagin's office Dr. Simon met a man who gave him the tickets he had ordered; at the same time Dr. Simon ordered tickets for his partner, Dr. Sylvan. Dr. Sylvan testified that he received these tickets in the mail on or about February 14, 1973; this transaction was the basis of Count II of indictment 74 CR 322. At the end of February, 1973 Dr. Simon again purchased airline tickets through Nagin for a flight between JFK and Florida, and he received these tickets through the mail. This transaction was the basis of Count I of indictment 75 CR 259.

George Nagin testified that he had been told by Cyphers about the availability of cheap airline tickets and that he had purchased tickets from Cyphers, at a discount, for his own use. Nagin also testified that either Cyphers or Ferro, Cyphers' nephew, picked up the money when Dr. Simon had ordered tickets. Cyphers had given Nagin a telephone number, 832–1211, in order that he could be reached for orders, and Nagin had given this number to Dr. Simon. This telephone number was proven to have been installed, together with an answering device, in Cyphers' apartment.

On March 19, 1973 an arrest warrant for Cyphers and Ferro was issued pursuant to a complaint of a Postal Inspector, and the warrant was executed against Cyphers and Ferro at Cyphers' apartment on March 20, 1973. Consent to search the apartment was obtained from Cyphers, and various drivers' licenses, credit cards, a credit card validator, and various credit card company bulletins reporting stolen credit cards were found in Cyphers' briefcase and in his apartment.

One of the seized credit cards bore the name of Richard Redstrom. Richard Rooney, manager of commercial credit for United Airlines, testified that a credit card bearing the account number found on the Redstrom credit card was issued by United Airlines to Richard Hedstrom and that the credit card had been altered to read Richard Redstrom. Richard Hedstrom testified he lost his credit card on February 23, 1973. Rooney testified that numerous airline tickets had been purchased on February 26, 1973 at Boston on the Hedstrom/Redstrom credit card and that the airline had received no payment for these tickets. The signatures on the Hedstrom/Redstrom charge slips were identified as Ferro's. The airline tickets purchased on February 26 included the one received by Dr. Simon at the end of February and others for flights leaving from Newark, Chicago, Cleveland, and Los Angeles.

It was stipulated that a Fred Preston Staff credit card had been reported lost and that three airline ticket charge slips were incurred with the use of the credit card after its reported loss. There was evidence from which the jury could believe that Cyphers had signed these airline tickets charge slips. One of these charge slips involved an airline ticket purchased in Newark for a flight scheduled to depart from Los Angeles.

■ While there is no direct evidence that either Cyphers or Ferro purchased either the tickets received by Dr. Simon on February 3 or the tickets received by Dr. Sylvan, the jury could find from the evidence summarized above and other evidence

(including two other lost credit cards that were found in Cyphers' briefcase on March 20 and had been altered and used by Ferro to purchase airline tickets that were not paid for) [2] that Cyphers and Ferro had a scheme that included the fraudulent purchase of Dr. Simon's February 3 tickets and Dr. Sylvan's tickets.

While Cyphers and Ferro might have delivered the tickets to Dr. Simon and Dr. Sylvan in person, they were mailed and the jury could find that these mailings were part of the general scheme to mail airline tickets to people in New York, Chicago, Cleveland, and Los Angeles. The jury could also find that the fraudulent scheme depended on repeat business from satisfied customers of Cyphers and Ferro and that the delivery of the tickets was an essential part of the scheme. Under the standards set out in *Finkelstein* the evidence was sufficient to support the conviction of both Cyphers and Ferro on all three counts.

## II.

■ Cyphers was represented by an attorney during the trial. Relying on *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and *Herring v. New York*, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975), Cyphers claims he has a sixth amendment right to make his own summation.

This reliance is misplaced. *Herring* does say that "a defendant who has exercised the right to conduct his own defense has, of course, the same right to make a closing argument." 422 U.S. 864, n. 18, 95 S.Ct. 2556. But neither *Faretta* nor *Herring* deals with a defendant who is represented by counsel and wishes to participate as co-counsel. In *United States v. Wolfish*, 525 F.2d 457, 462–63 (2d Cir., 1975) (per curiam), *cert. denied*, 423 U.S. 1059, 96 S.Ct. 794, 46 L.Ed.2d 649 (1976), which was decided after *Faretta* and *Herring*, we held that

a defendant who is represented by counsel has no sixth amendment right to participate as co-counsel. We reaffirm that holding.

## III.

On July 19, 1973 Ferro, who was on bail, surrendered to Ohio authorities to begin serving his prison term for a previous unrelated offense. On September 20, 1973 a writ of *habeas corpus ad prosequendum* was served, and on October 12, 1973 he appeared in the United States District Court for the Eastern District of New York and entered a plea of not guilty. He was then returned to the custody of Ohio authorities. On November 12, 1973 the United States lodged a detainer in Ohio against Ferro, and on January 25, 1974 the government served another writ of *habeas corpus ad prosequendum*. In the spring of 1974 Ferro appeared several times in the United States District Court for the Eastern District of New York, and on June 26, 1974 Judge Travia ordered Ferro "to be returned from whence he came." The records of the Bureau of Prisons indicate that he was returned to Ohio State Reformatory, Mansfield, Ohio. He was tried in January, 1976.

Ferro claims that his 1974 transfer to Ohio violates Article IV(e) of the Interstate Agreement on Detainers ("the Agreement"), 18 U.S.C.A. Appendix. Ferro first raised this claim in a supplemental brief filed with this court in October, 1976, and the government argues that his failure to raise this claim prior to trial constitutes a waiver under Rule 12(f) of the Federal Rules of Criminal Procedure.

■ While the policies underlying Rule 12(f) are helpful guides, they are not determinate in construing a statute. Article III of the Agreement provides that the defendant shall be brought to trial within 180 days after the detainer has been lodged provided that he makes a written request to that effect. Article IV(e), on the other hand,

---

**2.** This evidence was properly admitted during the government's case in chief, since it was not introduced solely to show the defendants' criminal character and its probative worth on the existence of the fraudulent scheme outweighed

its potential prejudice. *United States v. Grady*, 544 F.2d 598, 604 (2d Cir., 1976); *United States v. Torres*, 519 F.2d 723, 727 (2d Cir.), *cert. denied*, 423 U.S. 1019, 96 S.Ct. 457, 46 L.Ed.2d 392 (1975).

makes no reference to a request by the prisoner and says "if trial is not had on any indictment . . . prior to the prisoner's being returned to the original place of imprisonment . . . such indictment . . . shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice." In other words, if a state in which a prisoner is charged does not take the initiative to bring a prisoner back for trial the prisoner may require it to do so rather than suffer indefinitely the effects of the detainer on his imprisonment in the state of his incarceration. If a state does take the initiative and bring him from the state of imprisonment to the accusing state it must complete the prosecution before returning him. The main purpose of the Act is to provide means for expeditious resolution of all outstanding charges which may affect the conditions or duration of imprisonment and treatment. Article I of the Agreement says that one "purpose of this agreement [is] to encourage the expeditious and orderly disposition of such charges . . . ." Bringing Ferro from Ohio to New York in January, 1974, returning him to Ohio in the summer of 1974, and then again bringing him to New York for trial in New York in January, 1976, is not an "orderly disposition" of his federal case and violates Article IV(e).

Article IX of the Agreement says "[t]his agreement shall be liberally construed so as to effectuate its purposes." While the government initially argued on appeal (Supplemental Brief at 3, n. 2) that there was nothing in the record indicating that a detainer had been lodged against Ferro, the record now before us indicates that a detainer was lodged against Ferro. There is no showing that Ferro knew, prior to trial, that the detainer had been lodged against him. In such a situation we hold that Ferro may invoke Article IV(e) for the first time on appeal to this court.

We therefore order indictment 74 CR 322, which was filed on April 23, 1974, dismissed with prejudice as to Ferro. *United States v. Mauro*, 544 F.2d 588 (2d Cir., 1976). Indictment 75 CR 259 involving a separate transaction was filed on April 1, 1975 after Ferro had been returned to Ohio. Prosecution under it did not violate the Agreement and it will not be dismissed.

## IV.

Based on a complaint by Postal Inspector Robert McDowall, an arrest warrant was issued for Cyphers and Ferro on March 19, 1973 and they were both arrested on March 20, 1973. On September 18, 1973 a 43-count indictment, 73 CR 848, was filed against Cyphers and Ferro; 40 counts involved the mailing of credit invoices and three counts (counts 20, 21 and 22) involved the mailing of airline tickets to individual purchasers. On September 19, 1973 a notice of readiness was filed. Cyphers entered a plea of not guilty on September 20, 1973, and Ferro entered a plea of not guilty on October 12, 1973.

Following the Supreme Court's decision in *Maze* in January, 1974, appellants moved on February 19, 1974 to dismiss the original indictment. The motion was granted on April 5, 1974, and on April 23, 1974 a new indictment, 74 CR 322, was filed, charging Cyphers and Ferro with two counts of mailing of airline tickets. Count I of 74 CR 322 was derived from Count 20 of the original indictment. The government filed its new notice of readiness on May 13, 1974.

On April 1, 1975 the government filed another indictment, 75 CR 259, charging Cyphers and Ferro with one count of mailing an airline ticket. The government filed its notice of readiness on this indictment on June 6, 1975.

Trial on indictments 74 CR 322 and 75 CR 259 began on January 5, 1976. Cyphers and Ferro claim that the long delay between their arrest and the government's readiness for trial violates Rule 4 of the Eastern District Plan for the Prompt Disposition of Criminal Cases ("the Plan"). Ferro also claims that the 33-month delay between his arrest and the trial violates his sixth amendment right to a speedy trial.

In *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Supreme

Court set forth some of the factors the Court should consider in deciding whether a defendant's sixth amendment right to a speedy trial has been violated: "length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530, 92 S.Ct. at 2192.

In *Barker* the delay was over five years; here it was less than three years. Part of the delay is attributable to the illness of a key government witness (Dr. Sylvan), the change in legal theory necessitated by the Supreme Court's decision in *Maze,* and a shift in defense counsel. On April 9, 1975 Ferro moved to dismiss the indictments on the ground that his sixth amendment right was violated. Ferro does not claim that the delay prejudiced his defense. He claims (Brief for Appellant Ferro at 31–32) that he was prejudiced because his incarceration in New York during the spring of 1974 prevented a timely consideration of his parole by Ohio authorities and interfered with the rehabilitative possibilities of being incarcerated in Ohio; he also claims he was prejudiced by not being able to receive a federal sentence partly concurrent with his Ohio sentence. These types of prejudice, to the extent they are included in the holding of *Barker,* are less serious than the prejudice of an impaired defense. *Barker v. Wingo,* 407 U.S. at 532, 92 S.Ct. 2182. Engaging "in a difficult and sensitive balancing process," *Barker,* 407 U.S. 533, 92 S.Ct. 2193, we hold that Ferro's sixth amendment right to a speedy trial was not violated.[3]

Rule 4 of the Plan provides that "in all cases the government must be ready for trial within six months from the date of the arrest . . . or the filing of a complaint or of a formal charge upon which the defendant is to be tried (other than a sealed indictment), whichever is earliest."[4] Rule 5 of the Plan gives various provisions for tolling the six-month period.[5]

On December 18, 1974 Judge Platt denied appellants' motion to dismiss indictment 74 CR 322, and on April 18, 1975 he denied their motion to dismiss indictment 75 CR 259. In his first ruling he relied on Postal Inspector McDowall's affidavit that the investigation and preparation of this complex case extended beyond the date on which appellants were arrested, and Judge Platt ruled that Rule 5(c)(ii) of the Plan therefore tolled the six-month period. Judge Platt did not, however, make a finding as to when the government's investigation and preparation of the case was completed. Judge Platt's April 18, 1975 ruling does not fully articulate his reasons for denying appellants' motion.

For purposes of computing the six-month period of Rule 4 of the Plan, the time begins when Ferro and Cyphers were arrested on March 20, 1973. In this case the period initially stops when the government filed its notice of readiness on September 19, 1973.[6] Since Ferro was continuously incarcerated in New York and Cyphers was continuously on bail, the six-month period resumes when indictment 73 CR 848 was dismissed on April 5, 1974 and ends (1) on indictment 74 CR 322 when the government filed its notice of readiness on May 13, 1974 and (2) on indictment 75 CR 259 when the government filed its notice of readiness on June 6, 1975. Without taking account of any of the tolling provisions of the Plan, the period under Rule 4 of the Plan is, therefore, 7 months and 7 days for indictment 74

---

3. *But cf. United States v. Vispi,* 545 F.2d 328 (2d Cir., 1976) (20-month delay violates sixth amendment).

4. The full text of Rule 4 of the Plan is printed at *United States v. Flores,* 501 F.2d 1356, 1358 n. 1 (2d Cir., 1974).

5. The full text of Rule 5 of the Plan is printed at *Flores,* 501 F.2d 1359 n. 2.

6. Normally the period would end when the government filed its notice of readiness after the defendants had entered their pleas of not guilty. *United States v. Bowman,* 493 F.2d 594, 597 (2d Cir. 1974). But in this case the defendants' pleas were entered within a reasonable time of the government's filing of its notice of readiness and before our decision in *Bowman.*

CR 322 [7] and 20 months for indictment 75 CR 259.[8] We therefore remand for determination as to whether any of the tolling provisions of the Plan are applicable. *United States v. Flores*, 501 F.2d 1356 (2d Cir. 1974) (per curiam).[9]

Reversed and dismissed with prejudice as to indictment 74 CR 322 as to Ferro and remanded for further consideration in light of this opinion.

TIMBERS, Circuit Judge, concurring in part and dissenting in part:

I concur in the judgment and opinion of the Court in all respects with the exception of Part III, as to which I respectfully dissent, since I believe that Ferro's failure to raise his claim under Article IV(e) of the Interstate Agreement on Detainers (the Agreement) until his supplemental brief on appeal—never in the district court—constituted a waiver under Fed.R.Crim.P. 12(f).

A claim founded on a violation of Article IV(e) of the Agreement stems from the government's administrative treatment of the defendant after indictment and before trial. As such, it is a defense "based on defects in the institution of the prosecution" within the meaning of Fed.R.Crim.P. 12(b)(1) and "must be raised prior to trial" or it is waived under Fed.R.Crim.P. 12(f). Those defenses "capable of determination without the trial of the general issue" which may be raised at the defendant's option prior to or at trial—the principal examples being double jeopardy, res judica-

ta, statute of limitations and immunity—concern matters as to which only the fact of the prosecution's institution and not the details attending it are relevant. Furthermore, Article I of the Agreement states as its purpose "to encourage the expeditious and orderly disposition of . . . charges . . . ." In light of this, Ferro's Article IV(e) claim fairly may be characterized as a species of speedy trial claim. It is well established that a speedy trial claim must be timely asserted. See, e. g., *Barker v. Wingo*, 407 U.S. 514, 531–32 (1972); *United States v. Lustman*, 258 F.2d 475 (2 Cir.), cert. denied, 358 U.S. 880 (1958).[1]

I disagree with the majority's construction of the Agreement so as to render an Article IV(e) claim not subject to waiver. Such construction is not required by the Agreement or by any decision of the Supreme Court of which I am aware. On the contrary, the orderly administration of criminal justice, in my view, requires that Rule 12 and the Agreement be accommodated. The manifest purpose of Article IV(e) is deterrence. It bespeaks a judgment that only the ultimate sanction of dismissal of the indictment will insure the government's compliance with the Agreement's purpose of securing the expeditious disposition of charges which require the lodging of detainers. Since the government hardly can rely on defendants to fail to raise Article IV(e) claims in pre-trial motions,[2] no material interference with the

---

**7.** March 20, 1973-September 19, 1973: 3 months, 29 days
April 5, 1974-May 13, 1974: 1 month, 8 days
  Total time: 7 months, 7 days

**8.** March 20, 1973-September 19, 1973: 3 months, 29 days
April 5, 1974-June 6, 1975: 14 months, 1 day
  Total time: 20 months

**9.** Assuming, *arguendo*, that the district court, after the hearing, dismisses indictment 75 CR 259 with prejudice as to both Cyphers and Ferro and does not dismiss indictment 74 CR 322 as to Cyphers, a new trial would be unnecessary for Cyphers. The evidence concerning the transaction which forms the basis of indictment 75 CR 259 and the evidence dealing with Ferro's participation in the scheme were admis-

sible as to Cyphers on indictment 74 CR 322 (see fn. 2, *supra* ).

**1.** Even if the pre-trial motion requirement of Rule 12(f) were inapplicable, surely Ferro waived his claim under Article IV(e) for failure to have raised it at trial. See 8 Moore's Federal Practice ¶ 12.03[1] (2 ed. 1976); *United States v. Friedland*, 391 F.2d 378 (2 Cir. 1968), cert. denied, 404 U.S. 867 (1969).

**2.** Fed.R.Crim.P. 12(c) provides that the district court may set the time for making pre-trial motions. The Rule 12(f) waiver provision applies to any Rule 12(b)(1) motion not made at

deterrent purpose of Article IV(e) would result from the application of Rule 12(f).

Finally, the majority's holding that Ferro may invoke Article IV(e) for the first time on appeal on the ground that "[t]here is no showing that Ferro knew, prior to trial, that the detainer had been lodged against him", ante 635, strikes me as blinking at the hard facts. Whatever may have been the state of Ferro's knowledge of the detainer, he obviously knew of his own transfer to New York at the end of January 1974 and his return to Ohio prior to trial pursuant to Judge Travia's order of June 26, 1974. Under these circumstances, Ferro clearly had knowledge of facts sufficient to put him on notice of the existence of the claim which he waived under Rule 12(f). Cf. *Shotwell Manufacturing Co. v. United States*, 371 U.S. 341, 362–63 (1963); *United States v. Reynolds*, 300 F.Supp. 503, 505–06 (D.D.C.1969).

I therefore dissent from the dismissal of indictment 74 Cr. 322 as to Ferro and would include his two count conviction under that indictment in the remand for determination as to the applicability of the Eastern District Plan for the Prompt Disposition of Criminal Cases. Ferro himself, in his brief before us, suggested such a remand with respect to both indictments.

that time. It is not difficult to conceive of a situation in which a return to custody giving rise to an Article IV(e) claim might occur after the disposition of motions under Rule 12. Precisely that situation arose here. Ferro made a motion to dismiss indictment 74 Cr 322 on May 14, 1974. The motion was denied on June 4. He was not returned to Ohio until after June 26. But since the Article IV(e) claim did not come into existence until his return to custody, there was nothing to be waived by his earlier motion to dismiss. The obvious course would have been for the district court to entertain a second motion. Nothing in Rule 12 forecloses such a motion, since no Rule 12(f) waiver would have occurred. Significantly, Ferro could have included his Article IV(e) claim in the motion to dismiss which he made on November 20, 1974.