Charles JACKSON, Plaintiff,

v.

Harold J. SMITH, Superintendent, Attica Correctional Facility, Respondent.

Civ. No. 75–85.

United States District Court, W. D. New York.

Feb. 10, 1976.

Herman Schwartz, Buffalo, N. Y., for plaintiff.

Louis K. Lefkowitz, Atty. Gen., New York City, for defendant; Asst. Atty. Gen. James L. Kennedy, Buffalo, N. Y., of counsel.

## MEMORANDUM AND ORDER

ELFVIN, District Judge.

The petitioner is a state prisoner at Attica Correctional Facility and brings this action for a writ of habeas corpus under the provisions of Title 28, United States Code, Section 2254(a).

On July 7, 1971 the petitioner was convicted of murder of one Diane Thomas by a jury under New York Penal Law § 125.25 in the County Court of Erie County. On September 9, 1971, judgment was entered sentencing him to a term of imprisonment of twenty-five years to life.

Upon timely appeal, the New York Supreme Court, Appellate Division, Fourth Department, affirmed the conviction. The petitioner subsequently was denied leave to appeal by the Court of Appeals of New York.

This petition was filed January 21, 1975 and counsel was appointed.

At the outset, it should be noted that the sole task before me is to determine whether the alleged errors committed by the state courts constitute violations of the petitioner's rights under the United States Constitution. This court has jurisdiction to entertain an application for a writ of habeas corpus only on the ground that the petitioner's confinement violates the Constitution. 28 U.S.C. § 2254(a). Such writ may not issue to correct mere errors of the state law. See, *Schaefer v. Leone*, 443 F.2d 182 (2d Cir., 1971); *Lee v. Henderson*, 342 F.Supp. 561, 563 (W.D.N.Y., 1972).

The burden of proof on a habeas corpus petition falls on the petitioner seeking relief from a state conviction in federal court. He must establish by a preponderance of the evidence that the facts entitle him to a discharge from custody. See, *United States ex rel. Horelick v. Criminal Ct., City of N.Y.*, 366 F.Supp. 1140, 1150 (S.D.N.Y., 1973).

Viewing the facts in the light most favorable to the Government (as I must), the evidence offered at trial was as follows: About 11:30 p.m. on September 25, 1970, one Walter Lee Davis was walking down High Street in Buffalo when he was joined by the petitioner. The two men engaged in a general conversation while walking together about a block and a half. In front of 518 High Street, they met the deceased, Diane Thomas, and two of her girlfriends, Frances Carr and Gloria Farmel. Though both men were unknown to Carr and Farmel, Thomas did know Davis and she engaged him in a conversation. About this time a third male, Thomas Crawford, came from a nearby yard and joined the group. During the fifteen minutes that this group was together, the petitioner began talking with Farmel. Thomas rebuked the petitioner, telling him to leave Farmel alone. Shortly thereafter the petitioner pulled a gun, fatally shooting Thomas in the head. Farmel, upon hearing the shot, ran into the house. Carr looked up and saw a gun in the petitioner's right hand. She then immediately also ran into the house. Davis observed

the petitioner pull out the gun and shoot Thomas. The petitioner then shot at Davis and Crawford and Davis ducked behind a car and Crawford ran across the street. The petitioner then ran down Johnson Street, which runs perpendicular to High.

A cruising police patrol car stopped at the scene where a group of people had gathered. The policemen received a description of the assailant from Davis and Crawford and put it on their radio. Sometime later other police observed the petitioner walking on nearby Dodge Street and brought him to the scene of the shooting where he was taken out of the car by two policemen. The people who had gathered were asked if "this was the man". Crawford was the first to say he was. Five or six other people, including Davis, all agreed that the petitioner was the man. The petitioner was then put back into the car and driven away by the police.

Subsequently, a further series of identifications was arranged by the police or otherwise took place. Carr was taken to the precinct station. When she arrived, she found the petitioner with a police officer. The officer asked, "Was he the one?" and Carr answered affirmatively. Carr got another look at the petitioner that night when she was at police headquarters for questioning and saw the petitioner down the hall with two policemen.

Davis also made a station-house identification. As with Carr, the petitioner was seen by himself by the witness, in a one-on-one show-up; the petitioner then was in handcuffs. The show-up was introduced by the police asking Davis if he could "identify Charles Jackson".

A *Wade* hearing was held at the beginning of the trial at which Farmel, Carr and Davis testified. The police officers did not testify. Defense counsel had not arranged to have them present at the time of the hearing, and the trial judge denied a postponement so that defense counsel could make such arrangements belatedly. The judge found that the identifications were not "tainted or suggestive". No finding of independent origin was made, since the identifications were found to be legal. The petitioner then was convicted, after a trial by jury.

The petitioner alleges four grounds in challenging his conviction. Specifically he complains that (1) the identification procedures were unduly and unnecessarily suggestive, (2) it was error to allow testimony of a previous identification by a person not an eye-witness, (3) it was unconstitutionally prejudicial to allow the jury to view the petitioner in handcuffs, and (4) the evidence does not support the verdict.

■ In-court eye-witness identifications and testimony concerning out-of-court identifications are not admissible if the circumstances were so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification. The Supreme Court has made it clear, however, in *Neil v. Biggers*, 409 U.S. 188, 196–201, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), that suggestiveness of the confrontation alone is not enough to require the exclusion of the ensuing identification. The crucial question is whether, based on the totality of the circumstances, there is a very substantial likelihood of misidentification. The factors to be considered, in evaluating the likelihood of misidentification, include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.,* at 199–200, 93 S.Ct. at 382.

■ Applying the above indicia of reliability to the identifications in this case, the petitioner's due process rights were not violated. While the out-of-court confrontations between the petitioner and the eye-witnesses were unnecessarily suggestive, there was no very substantial likelihood of misidentification.

As to Davis's identification of the petitioner, the facts demonstrate that misidentification was unlikely. Davis had been acquainted with the petitioner for four years prior to the fatal night. On that night, Davis met, conversed, walked and stood with petitioner at least half an hour on an illuminated city street. At the time of the shooting, Davis was standing in close proximity to the petitioner. Davis, in conjunction with Crawford (a non-testifying eye-witness), supplied a description which resulted in the petitioner's apprehension. There was no allegation that his identification of the petitioner at the scene within an hour of the shooting or later at the police headquarters lacked certainty. Opposing these factors are the following considerations: the event took place at night; the description given to the police did not include petitioner's name; the on-the-scene identification was made in the presence of a crowd and with the appearance that the petitioner was in police custody; and, finally, Davis was not the first to identify the petitioner. The totality of the circumstances is insufficient to support a finding of a very substantial likelihood of misidentification by Davis.

The identification by Carr has also been attacked by the petitioner as having been tainted by unnecessarily suggestive show-ups at the police station and at police headquarters. There is also a claim that Carr was present when the petitioner was presented to the crowd at the murder scene; however, it is only Davis's inconsistent testimony which places her in the crowd. Carr's testimony contradicts this facet of Davis's narration and it is accepted for present purposes that she was not present. Carr's contact with the petitioner was for about fifteen minutes on an illuminated city street. She testified that the petitioner's face was in her view at a short distance for ten minutes. She was within a few feet of the petitioner when the fatal shot was fired. Further, there was no uncertainty of identification at the show-ups occurring shortly afterward or at the trial. The facts that point toward the possibility of misidentification are the following: the incident was at night; the illumination was not as bright as day; the petitioner's face was not visible to her at all times during their contact on the street; and the usual infirmities of one-to-one show-ups were present. The totality of the circumstances does not lead to the conclusion that there was a very substantial likelihood of misidentification inasmuch as Carr had sufficient time and illumination to view the petitioner.

■ As to the petitioner's claim that it was error to allow proof of previous out-of-court identifications by Davis and Carr who testified at the trial, it is sufficient to reiterate that this Court's jurisdiction does not extend to the corrections of mere errors of state law. *Schaefer, supra,* and *Lee, supra.* Whether Section 60.25 of New York's Criminal Procedure Law was violated is not reviewable here without some federal constitutional basis. The hearsay nature of the testimony complained of does not raise a constitutional issue. *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). However, the absence of cross-examination and confrontation of Crawford does raise constitutional questions. *Douglas v. Alabama,* 380 U.S. 415, 418–20, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965).

■ Nevertheless, it is my opinion that the admittance by the trial judge of the constitutionally infirm identification testimony does not bolster the petitioner's claim sufficiently to raise it to a level of a denial of a fair trial. When Officer Pelletier testified on direct examination that seven or eight people identified the petitioner at the scene, no objection was made by defense counsel and, when the officer was cross-examined, defense counsel himself returned to the subject of the identification by the crowd at the scene. When Officer Miller testified, the defense counsel objected and was sustained as to any reference by the witness to identification at the scene. When Officer Lewis testified as to identification at the scene, defense counsel

objected; the trial judge this time permitted the witness to testify but only for the purpose of showing that identification had been made by an individual or individuals. Defense counsel objected to this, but, when he was reminded by the trial judge that he had purposely elicited similar testimony, he explained that he had sought to characterize the on-the-scene identification as "sort of a Christ-and-Barahbas [sic] identification". He wished, however, to limit its use. In light of this inconsistent position of the defense and the presence of one of the on-the-scene identifiers, Davis, in court for confrontation and cross-examination, the admission of the testimony complained of did not result in a denial of a fair trial. The return of the petitioner to the scene had a purpose and substantial necessity. A description of the assailant had been given to the police officers but without the assailant's name. The description was put on the police radio and other officers spotted the petitioner on a nearby street. He was not placed under arrest but was requested to go with the police to the scene and he acquiesced. (The police officer testified that he probably would have arrested the petitioner if he had refused to comply with what the officer considered a reasonable request, but this did not come about.) Some fifteen or twenty persons had gathered at the scene and there was some testimony of a general cry of "That's him". This general reaction was not significant to the police or to the jury. It was important to the former that two individuals who had witnessed the crime identified the petitioner as the assailant and the petitioner was thereupon promptly arrested and removed from the scene. It was overwhelmingly clear to the jury that only Farmel, Carr, Davis and Crawford were witnesses to the shooting and that the latter two made individual identifications of the petitioner when he voluntarily returned to the scene and before he was placed under arrest. Davis, as already noted, appeared at the trial as a prosecution witness and confronted the petitioner and the jury and was cross-examined by the petitioner's attorney. Crawford did not appear and testify but this was no fault of the prosecution which made extensive efforts to find him and put him on the witness stand. Farmel testified but did not identify the petitioner. Carr identified him in court as the one who had shot Thomas and was firm in stating that her in-court identification had its origin and substance from her observation of the petitioner during a period of about fifteen minutes when the six individuals were together prior to the shooting. She said nothing about any identification made at the scene by Crawford or Davis. Davis identified the petitioner in court and said he had been acquainted with him for about four years and had walked with him for two blocks and for about half an hour before they had met the three girls (Crawford joining the group soon thereafter). He was positive in his identification which was grounded solely on the events at the time. He did state that Crawford and Farmel had identified the petitioner when the latter returned to the scene with the police. This is not the situation which was presented in *Douglas v. Alabama, supra*, where the sole identification of Douglas came to the jury without any confrontation or cross-examination of the source of that out-of-court identification. The petitioner's identification was here constitutionally and sufficiently made out.

■ The petitioner's allegation that it was unconstitutionally prejudicial to allow the jury pool and jury to view the petitioner in handcuffs is also insufficient to show a denial of a fair trial. The petitioner alludes to three instances when this occurred. Only two of these instances are outlined in the trial record sufficiently to warrant comment. Firstly, the petitioner had sat for four or five minutes in the presence of the full pool of jurors in handcuffs and in the presence of two deputy sheriffs. However, when the trial judge offered to question the prospective jurors as to possible prejudice and also offered to replace the present panel with another, the petitioner's counsel refused on the ground that

he did not want to inconvenience the judge. In a similar situation in *United States v. Torres*, 519 F.2d 723, 727–8 (1975), the Second Circuit Court of Appeals found such not to be flagrantly prejudicial where a voir dire had been conducted. In light of the petitioner's counsel's waiver of a voir dire or change of the panel, the degree of unfairness is not sufficient to invoke a reversal. *Hardin v. United States*, 324 F.2d 553, 554 (5th Cir., 1963).

Secondly, the petitioner, at the start of one session of the jury selection process, was sitting briefly in a "box" with another prisoner who was handcuffed and in the presence of two deputy sheriffs. This viewing is quite different from those cases where a defendant is viewed in restraints or shackles. There is no possibility that such was flagrantly prejudicial to petitioner. It, however, would ignore reality to say that a view or views of a defendant in custody do not result in some prejudice. Any such would have been minimized by an expeditious determination of the effect upon the jurors. In light of the defense attorney's waiver of such step after the more prejudicial viewing, I cannot find a degree of unfairness sufficient to comprise a deprivation of constitutional rights.

Lastly, the petitioner contends that there was insufficient evidence to support a conviction. The sufficiency of evidence presents a constitutional issue cognizable in a habeas corpus proceeding only if the conviction is so devoid of evidentiary support that a due process problem is raised. *United States ex rel. Terry v. Henderson*, 462 F.2d 1125, 1131 (2d Cir., 1972); *United States ex rel. Bates v. Mancusi*, 360 F.Supp. 1340, 1344 (W.D.N.Y., 1973). The testimony of two eye-witnesses supplies sufficient support for the petitioner's conviction. There also was testimony concerning blood found on the petitioner's sneakers. The groupings of the blood on the sneakers and of that of the deceased were both AB, which the petitioner stipulated is found in only 5% of the black population

of which decedent Thomas had been a member.

Petitioner's application for a writ of habeas corpus should be and hereby is denied.