[No. A065578 First Dist., Div. Three. Aug. 15, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
TUNG YIU TAI, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part IIB.

**COUNSEL**

Oliver J. Northup, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Laurence K. Sullivan and Rene A. Chacon, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MERRILL, J.—**

I

Appellant Tung Yiu Tai was charged by information with fraudulent use of a credit access card (Pen. Code,[1] § 484g), forgery of a credit access card (§ 484f, former subd. (1)), and commercial burglary (§ 459). The information also set forth allegations that Tai had suffered two prior felony convictions, making him ineligible for probation (§ 1203, subd. (e)(4)), and one enhancement allegation for having served a prior prison term (§ 667.5, subd. (b)). Tai pleaded not guilty and denied the allegations.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

In the trial which followed, the jury found Tai guilty as charged and found all allegations true. Tai was sentenced to three years in state prison for the fraudulent use of a credit access card and a consecutive one-year term for the prior prison term enhancement. Sentence on the remaining two counts was stayed pursuant to section 654.

## FACTS

*Charged Offenses*

Julia Woo, an employee of Macy's in Corte Madera, testified that on August 7, 1993, an Asian couple asked for assistance in purchasing male and female watches. She showed them Movado watches which the male customer liked and decided to buy. He did not ask the cost and handed Woo a Visa card for payment. The transaction took place very quickly. Woo ran the card's magnetic strip over the scanner and the purchase was approved. However, she became suspicious when she saw the card's signature strip peeling off. When she asked the man for identification, he gave her a driver's license. She then called store security and told the man making the purchase that the transaction required approval. He asked that the credit card and receipt be returned to him and stated he would return with cash if there was any trouble. Woo returned the card but kept the receipt.

Woo examined the receipt after the suspects left and noted that the credit card number imprinted from the card did not match the number which appeared on the computer printout after she "swiped" the card's magnetic strip through the register.

Woo informed Macy's security officer, Leigh Bakhtiari, of the suspicious transaction, providing a description of the couple, their clothing and the direction in which they were walking. Bakhtiari caught sight of them in the store's security camera and confirmed with Woo over the telephone that the couple she was observing on camera was the same couple about whom Woo had telephoned. Bakhtiari then followed the suspects on foot as they walked out of Macy's into the mall and to a car. She observed that the suspects did not look into store windows, seemed very nervous, walked quickly and turned around several times to look behind them. Bakhtiari described the man as having distinct arched eyebrows, a square, full face with a cold sore on his top lip, and slightly wavy hair. She identified Tai as the man she followed.

Bakhtiari met Officer Patrick Torres of the Twin Cities Police Department in the parking lot and entered his marked police car. The suspect couple

drove out of the parking lot and onto southbound Highway 101. Officer Torres and Bakhtiari followed. The officer signaled Tai to pull over after he made an illegal lane change. Tai ignored several opportunities to pull over but finally did so. Tai gave Officer Torres an identification card, stating he had not yet received his driver's license. The female suspect stated she was Charla Wong. Tai denied being in Macy's earlier and accused the officer of racial bias. Tai consented to a search of his car and Sergeant Michael McDuffee found a Nordstrom's return receipt in the name of Jennifer Lee showing that a transaction took place at 3:38 p.m. that day. Wong denied that she was Jennifer Lee and Tai responded that he had been to Nordstrom with someone else. A second Nordstrom return receipt found in the car bore the name of Joe Gian Zhou Chen and a San Francisco address. The officers also observed a full length Nordstrom garment bag in the car. In a consensual search of Tai's person, Officer Torres discovered a driver's license in the name of Joe Chen. This license number matched that shown on the Nordstrom return receipt in Chen's name. Tai explained that the license belonged to his cousin.

The officers released Tai and the woman who identified herself as Charla Wong, when due to communication problems with Macy's, they were unable to verify that a crime had occurred.

The credit card which Tai attempted to use at Macy's had been issued to Arlene Lynn of Alameda County by Nations Bank. When Nations Bank received an inquiry from Macy's about Lynn's account number on August 7, 1993, one of its representatives contacted Lynn informing her someone attempted to use her card to purchase merchandise. Lynn reported that she still possessed her sole card and that $2,122.38 worth of fraudulent charges had been made in over 25 transactions. Kay Collins, a Nations Bank investigator who qualified as an expert in credit card fraud investigation, opined that a counterfeit card had been presented at Macy's. She came to this conclusion from the fact that Lynn still possessed her card at the same time that fraudulent charges were being made on it. Collins also testified that the magnetic strip on cards includes account information and that such information should match embossed information on card faces. Any discrepancy indicates a counterfeit card. The Macy's sales receipt, showing two different card numbers, and an erroneous expiration date, led Collins to conclude the card used for the attempted purchase was counterfeit.

*Uncharged Misconduct*

The jury also heard testimony about Tai's arrest on December 2, 1991, at 3 a.m., at a Safeway store in San Francisco. Tai was shopping with another

Asian man and purchased $312 in groceries by using a credit card that bore the Caucasian name "Edward Schneider." At this store the customer "swipes" the card through a small box on the counter so the store clerk does not see the name on the card. Tai signed the receipt from this transaction "T. Tung Tai." After checking out, Tai and his companion returned to shop some more. Store employees became suspicious and contacted the police when the two men were randomly throwing items into the cart. When police stopped Tai inside the store, he stated he worked for a law firm and neither he nor his cousin could be detained. After the officers informed him of their investigation, Tai stated he found the card outside, had used it to purchase the groceries and "was going to return it to the guy" who lost it. The two arresting officers in the Safeway incident identified Tai as the individual they arrested that evening.

Schneider's credit card had been issued to him on November 22, 1991, and mailed from Household Credit Services in Salinas on November 26, 1991. When Schneider notified the company he had not received his card, the card was blocked on November 30, 1991. A postal investigation revealed a postal employee was intercepting credit cards issued by Household Credit Services before they were shipped to their destinations.

Evidence was received that a credit card issued to Susan Cheung by Bank of America had been used fraudulently. Cheung reported several fraudulent purchases in July 1993, including one at Sharper Image in San Francisco in the amount of $2,624.70. The invoice from this July 18, 1993, transaction showed that the embossed account number matched the number imprinted from the magnetic stripe. While the number was that issued to Cheung, the name imprinted by the card was Zhen Y. Guo. The receipt also bore the signature of Zhen Guo. Cheung's card number was the embossed number that appeared on the August 7, 1993, Macy's receipt. Zhen Yu Guo testified he did not know Tai and has no credit cards issued by Nations Bank or Bank of America. He conducted no transactions at Macy's on August 7, 1993.

Nordstrom sales manager Ann Sandhu testified that at approximately 3 p.m. on August 7, 1993, a well-dressed Asian couple wanted to return a blazer for cash. While Nordstrom does not require a receipt for such a transaction and these customers had none, Sandhu became suspicious when information on the back of the garment tag made no sense. She asked the woman for her driver's license but the woman said she did not have one. The man then offered his license. Sandhu noticed immediately that the man pictured on the license did not match the person standing before her. At this point Sandhu copied the information off the license and contacted Nordstrom security. Sandhu and security personnel decided the couple would

only receive merchandise in exchange. They were not to receive any cash back. The couple appeared anxious and within five minutes selected several items which the woman did not try on. The woman signed the receipt as Jennifer Lee, 39 Raymond Street. The name on the man's license was Joe Gian Zhou Chen. Sandhu handed the woman the clothing in a Nordstrom garment bag and the couple left. Sandhu later identified the suspects in a photographic lineup and from the Macy's videotape. She had identified Tai instantaneously and was 100 percent certain of her identification. At trial, she also identified Tai as the male suspect who had returned the blazer. Sandhu also positively identified Charlamein Tai from a photographic lineup as the woman involved in the return transaction.

In his defense, Tai presented the testimony of Howard Lee, a 16-year-old, who stated that he and his girlfriend Kim Nguyen had attempted to buy the watches at Macy's on August 7 after he found a credit card bearing the name "Zhen" at a bowling alley in San Francisco's Japan Town. Lee, a friend of Tai's, had planned to get together with Tai and his wife that day. It was Tai's idea to go to a shopping mall in Marin County. Tai and his wife went in their car and Lee, Nguyen and a friend, Johnny Lau, went in a separate car. Lee did not tell Tai or Nguyen about the credit card. After parking in the lot, the Tais went to Nordstrom and Lee and Nguyen went to Macy's. When the clerk at Macy's asked for identification for the credit card purchase, Lee became frightened and asked for the credit card back. Lee and Nguyen returned to their car and drove back to San Francisco with Lau. Lee used the card to purchase take-out food from a Chinese restaurant later that night and then threw the card into a garbage can.

Charlamein Tai, Tai's wife, testified that she and her husband never went to Macy's that day. When the group of friends decided to drive to Marin County to go shopping, Tai accompanied her to Nordstrom so that she could return a blazer on behalf of a friend's cousin. Jennifer Lee, the name she signed on the Nordstrom receipt, was what she believed to be the name of the friend's cousin. When Charlamein and her husband were unsuccessful in contacting Lee by pager they drove home.

On cross-examination, Charlamein admitted applying for a driver's license three times under the name Charlamagne Wong and twice under the name Charla Tai.

Tai also presented the testimony of Mary Gee, an employee of the New Lucky Restaurant in San Francisco, to the effect that she handled a credit card purchase of take-out food August 7, 1993, to a Zhen Y. Guo. The credit card number on the restaurant receipt was the same as that used in the attempted purchase at Macy's.

*Handwriting Exemplars*

At the request of a district attorney's investigator, Tai provided handwriting exemplars. The investigator asked Tai to sign different names. After 20 minutes of writing, Tai complained that his hands were tired. The exemplars were examined by David Moore, an examiner of questioned documents with the Department of Justice. Moore compared examples of Tai's known handwriting with the exemplars, questioned merchants' receipts and questioned Department of Motor Vehicle forms and opined that the exemplars "were not naturally written and were written with the intent to disguise." Moore testified that the exemplars differed from the normal course-of-business writings presented in Tai's known handwriting samples, which have an ebb and flow to them and variations in pressure in the up-and-down strokes. In contrast, the writings in the exemplars were much smaller, and were written more slowly and haltingly and in contradictory ways. Despite the intent to disguise the exemplars, Moore arrived at the "limited conclusion" that there were indications the person who had written the known writings was also the writer of the questioned signatures. He based this opinion on similarities in the lower case letter "h" in the name Thomas and in the name Zhen.

II

DISCUSSION

A. *Expert Opinion of Altered or Disguised Handwriting*

Tai provided handwriting exemplars pursuant to court order. Before expert testimony concerning the exemplars was introduced, defense counsel objected to the introduction of evidence that Tai altered or disguised his handwriting on the exemplars on the basis that it would violate Tai's privilege against self-incrimination. The trial court overruled the constitutional challenge. On appeal, Tai contends the admission of the contested testimony constituted prejudicial error requiring reversal. We disagree.

The Fifth Amendment privilege against self-incrimination protects against compelling the communications or testimony of the accused, and not real or physical evidence derived from him or her. (*Gilbert* v. *California* (1967) 388 U.S. 263, 266-267 [18 L.Ed.2d 1178, 1183, 87 S.Ct. 1951]; *Schmerber* v. *California* (1966) 384 U.S. 757, 764 [16 L.Ed.2d 908, 916, 86 S.Ct. 1826].) Requiring a criminal defendant to provide a handwriting exemplar does not compel the defendant to provide evidence of a communicative or testimonial nature. The provision of handwriting exemplars does not violate the Fifth Amendment, as handwriting, an identifying physical characteristic, is non-testimonial in nature. (*Gilbert* v. *California, supra*, 388 U.S. at pp. 266-267 [18 L.Ed.2d at p. 1183].)

■ Tai acknowledges that the taking and use of his handwriting exemplars do not implicate the Fifth Amendment privilege. His challenge is to the content of the handwriting expert's testimony that he attempted to disguise or alter his handwriting. Tai maintains that this testimony made the furnishing of the exemplar testimonial in nature.

This precise issue has not been discussed by the courts of our state. However, in two decisions of the federal circuit courts, this contention has been considered and rejected. In *United States* v. *Stembridge* (5th Cir. 1973) 477 F.2d 874, 875], the handwriting expert testified on redirect examination that he was unable to draw a conclusion about the writer of the questioned document when comparing it only to the handwriting exemplars provided by defendant because the exemplars demonstrated attempts to intentionally disguise or distort normal writing. The court of appeals rejected the defendant's contention that this opinion testimony implied a consciousness of guilt and thus violated her Fifth Amendment privilege. The *Stembridge* court analyzed that handwriting exemplars, unprotected by the self-incrimination privilege, require the defendant's physical cooperation in order to obtain valid samples. "The accused has not been permitted to frustrate the prosecution's right to this evidence by simply refusing to give the required exemplars." (*United States* v. *Stembridge, supra*, 477 F.2d at p. 876.) *Stembridge* reasoned that it was not improper for a prosecutor to comment upon a defendant's refusal to provide a handwriting exemplar. Nor was it improper for a court to instruct a jury that it may draw an inference that a comparison of the exemplar with questioned signatures would have proven unfavorable to the defendant. (*Ibid.*, citing *United States* v. *Nix* (5th Cir. 1972) 465 F.2d 90], and *United States* v. *Doe* (2d Cir. 1968) 405 F.2d 436].) The court equated an attempt to disguise a handwriting exemplar to the refusal to provide one, stating "for if an accused were free to disguise his writing, without any sanctions, exemplars would be worthless. Hence it is not improper for the prosecution to show that the defendant attempted to avoid providing a valid handwriting sample by intentionally distorting his handwriting." (*United States* v. *Stembridge, supra*, 477 F.2d at p. 876.)

Similarly, in *United States* v. *Wolfish* (2d Cir. 1975) 525 F.2d 457, 461], certiorari denied *sub nom. Wolfish* v. *United States* (1976) 423 U.S. 1059 [46 L.Ed.2d 649, 96 S.Ct. 794], prosecutorial comment on rebuttal closing argument that the defendant's efforts to disguise his handwriting, as the handwriting expert testified, was evidence of his guilt was held to be proper. In *Wolfish*, the defendant refused to write out complete words on the exemplar as requested and wrote the Hebrew letters from bottom to top instead of from top to bottom as is usually done. The *Wolfish* court concluded that the prosecutorial comment was justified and not violative of the Fifth Amendment. (*United States* v. *Wolfish, supra*, 525 F.2d at p. 461.)

Just as a defendant's refusal to provide a handwriting exemplar is admissible evidence of consciousness of guilt (see *People* v. *Clark* (1993) 5 Cal.4th 950, 1003 [22 Cal.Rptr.2d 689, 857 P.2d 1099]), so too is opinion evidence of a defendant's efforts to disguise his handwriting on an exemplar. Since a defendant has no privilege to refuse to provide a court-ordered handwriting exemplar, his or her attempts to alter or disguise this physical characteristic is admissible evidence of consciousness of guilt. The Fifth Amendment privilege against self-incrimination is not implicated by the admission of such expert opinion testimony.

B.   *Admission of Evidence of Uncharged Misconduct**

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

## III

### DISPOSITION

The judgment is affirmed.

Chin, P. J., and Corrigan, J., concurred.

A petition for a rehearing was denied September 13, 1995, and appellant's petition for review by the Supreme Court was denied November 16, 1995.

---

*See footnote, *ante*, page 990.