# IN THE SUPREME COURT, STATE OF WYOMING

## 2019 WY 93

APRIL TERM, A.D. 2019

*September 10, 2019*

HOLLY ANNE HERRERA,

Appellant
(Defendant),

v.

S-18-0187

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Hot Springs County*
*The Honorable Robert E. Skar, Judge*

*Representing Appellant:*

Office of the State Public Defender: Diane Lozano, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel. Argument by Mr. Morgan.

*Representing Appellee:*

Peter K. Michael, Wyoming Attorney General; Christyne M. Martens, Deputy Attorney General; Samuel Williams, Assistant Attorney General. Argument by Mr. Williams.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, **Chief Justice**.

[¶1]    A jury convicted Holly Herrera of three counts of child endangerment and one count of possession of a controlled substance.  On appeal, she claims that her Fifth Amendment right to remain silent was violated when the district court allowed testimony regarding her contamination of a urine sample she was compelled to provide.  We affirm.

## ISSUES

[¶2]    Ms. Herrera raises a single issue on appeal, which we state as:

> Was Ms. Herrera's Fifth Amendment right to remain silent violated when the district court admitted testimony regarding her contamination of a compelled urine sample?

The State frames the issue similarly, but also raises the additional question of whether Ms. Herrera waived her Fifth Amendment claim when she failed to raise it in the district court.

## FACTS

[¶3]    At around 12:00 a.m. on July 1, 2017, Wyoming Highway Patrol Trooper Beatriz Schulmeister stopped a vehicle outside Thermopolis, Wyoming for failure to have the rear license plate illuminated.[1]  She approached the vehicle on the passenger side, and she initially saw a little girl and two young boys sleeping in the back seat, and a male driver and an adult male passenger in the front.  She knocked on the front passenger window, and when it was rolled down, she introduced herself and informed the driver of the reason for the stop.  When she asked for his driver's license, insurance information, and registration, the driver admitted that he did not have a license on him, and that his license had been suspended.

[¶4]    Trooper Schulmeister asked both the driver and his passenger their names and dates of birth so that she could verify the suspension and determine whether the passenger, who said he was licensed but did not have his license with him, would be available to drive the vehicle when the stop concluded.  She wrote that information down and again asked for insurance and registration.  She noticed that both the driver and the passenger were nervous when they pulled documents from the glove box and console, and that they were moving fast without looking at the paperwork.  She also observed that the windshield was broken, and she asked how long it had been like that.  The driver responded that he did not know because the vehicle belonged to his sister, Holly Herrera.

---

[1] According to Trooper Schulmeister, the rear license plate is legally required to be illuminated and officers are trained to watch for a lack of lighting as evidence of a stolen vehicle.

[¶5]    Trooper Schulmeister ran a check on the information she was given and confirmed that the driver was Christopher Decker and that the front passenger was Derek Fyffe. Because the vehicle had only temporary tags, she was not able to run those for vehicle ownership information, and she returned to the vehicle to again ask for the registration and proof of insurance. She approached on the passenger side but then pointed her flashlight at the driver's side because Mr. Decker was moving about in a nervous manner that concerned her, and she wanted to see his hands. While she was shining her flashlight on the driver's side, its light glanced off of the back seat, and Trooper Schulmeister saw the top of a head underneath one of the children. The person was sitting low in the seat behind the driver's seat and was not wearing a seatbelt. Trooper Schulmeister knocked on the window to ask about the seatbelt and found that the additional passenger was an adult female.

[¶6]    That adult female was Holly Herrera, but when Trooper Schulmeister asked her to identify herself, Ms. Herrera gave her a false name, Jacqueline Marie Cardenas, and a false birth date. She said she did not have a current driver's license but that she had a suspended Nevada license. After Trooper Schulmeister obtained Ms. Herrera's information, she told Mr. Decker and Mr. Fyffe that she still needed the vehicle registration. Mr. Fyffe looked in the glove box again and found a certificate of title, which he gave to Trooper Schulmeister.

[¶7]    The certificate of title identified Holly Herrera as the vehicle's owner, and Trooper Schulmeister returned to her patrol car to verify the vehicle ownership and the information Ms. Herrera had given her. She was unable to verify the information Ms. Herrera gave her and requested clarification of the correct spelling for her name and her birth date. Ms. Herrera again provided false information, changing the spelling of the false name slightly and date of birth, and Trooper Schulmeister was again unable to verify the information. She then asked Ms. Herrera to write down her information so she could be sure she had the correct spelling and birth date. In response, Ms. Herrera provided false information a third time, again using the same name with minor adjustments to its spelling and her birth date, and Trooper Schulmeister was again unable to verify the information.

[¶8]    By this time, Sergeant Jerimie Kraushaar of the Hot Springs County Sheriff's Office had arrived to provide backup. He used information from the certificate of title to find Holly Herrera's Facebook profile and based on the profile photo determined Ms. Herrera's true identity. He informed Trooper Schulmeister of this, and that there was an outstanding warrant for Ms. Herrera's arrest. Trooper Schulmeister cited her for interference with a peace officer and placed her under arrest.

[¶9]    The children in the vehicle were Ms. Herrera's twelve-year-old son, a fourteen-year-old neighbor boy, and Mr. Decker's four-year-old daughter. Trooper Schulmeister requested that dispatch contact the Wyoming Department of Family Services for assistance

2

with the children, and that it send a wrecker to tow the vehicle. It had to be towed because Mr. Decker's driver's license was suspended, Mr. Fyffe did not have a license on him, and Ms. Herrera was under arrest.

[¶10] Before the vehicle was towed, Trooper Schulmeister inventoried it, as required by Wyoming Highway Patrol policy. During her inventory, she found a white baggy containing a white powdery substance on the floor between the driver's seat and the door. The State Crime Lab later identified the substance as methamphetamine. She also found a bag of unused syringes in the glove box. On the floor behind the driver's seat, she found a "torch," which she recognized as a type of lighter commonly used to smoke controlled substances from a pipe. In the middle of the back seat floor, she found a pink and black cosmetic case that contained cosmetics and a glass pipe wrapped in a paper towel. The glass pipe contained a residue that the State Crime Lab identified as methamphetamine.

[¶11] The outstanding warrant for Ms. Herrera's arrest was for a probation violation. As a condition of her probation, Ms. Herrera was required to submit to urine testing, and on July 3, while she was still in the detention center, Trooper Schulmeister asked her to provide a urine sample. On her first attempt to provide a sample, which was observed by Trooper Schulmeister, Ms. Herrera said she was unable to produce one. On her second attempt a short time later, also observed by Trooper Schulmeister, she was able to urinate but contaminated the sample by dipping it into the toilet water. Because the sample was contaminated, Trooper Schulmeister did not submit it for analysis and made no further attempts to obtain a sample.

[¶12] On July 6, 2017, the State filed an information charging Ms. Herrera with three felony counts of child endangerment-exposure to methamphetamine, and one misdemeanor count of possession of a controlled substance. Before trial, Ms. Herrera requested notice of the State's intent to introduce W.R.E. 404(b) (other acts) evidence, and the State provided no such notice.

[¶13] A jury trial was held February 14-16, 2018. During defense counsel's cross-examination of Trooper Schulmeister, the following exchange occurred concerning Ms. Herrera providing a false name and birth date (footnote added):

> Q. Okay. You made a statement yesterday that oftentimes people – oftentimes people who have warrants don't give their correct names; do you remember making that statement yesterday?
>
> A. Yes.
>
> Q. Okay. Do you run into that quite often? Well, you've apparently run into it before?

3

A.    Can you give me a minute to think about it?

Q.    Yeah, that's fine.

A.    I don't think that people gave me the wrong names, I don't recall – I don't recall anybody having a warrant, maybe they were just lying because something else.

Q.    Okay. With Mr. Fyffe you were really digging there because things weren't matching up?

A.    Yes.

Q.    And there was a warrant for him, okay, and so you were at that time thinking, "Well, he's possibly given me some false information because he's got a warrant; is that correct?[2]

A.    Yes.

Q.    So that was kind of going through your mind. You eventually found out who Ms. Herrera was; is that correct?

A.    Later on, yes.

Q.    Later on. And you also found out that she had a warrant; is that correct?

A.    Yes.

[¶14]  On redirect examination, the prosecutor asked Trooper Schulmeister if she knew the basis for Ms. Herrera's arrest warrant. The district court sustained a defense objection, and when the prosecutor asked an additional question about conditions related to the warrant, the following occurred in chambers:

THE COURT:    All right. We're on the record outside the presence of the jury. We're doing some redirect on the trooper. There is a question concerning the basis for the warrant that was issued for Ms. Herrera that was testified to. Counsel

---

[2] There was no warrant for Mr. Fyffe's arrest. The confusion arose because when Trooper Schulmeister ran a check of his name, it showed a warrant. On further checking, Trooper Schulmeister determined the warrant was for Mr. Fyffe's twin brother.

4

lodged an objection, the Court ruled and sustained the objection based on the fact that it's not relevant. Now Counsel, you've asked another question. Go ahead.

[PROSECUTOR]: Your Honor, first of all, and I know the Court has ruled on this, but Defendant is the one that opened the door to the warrant in the first place. The State did not. The State specifically kept that information from the jury, and it was on the cross-examination that the issue of the warrant came up, then there was other testimony about why people lie and, "People oftentimes lie who have warrants. And just lying – just lying because of something else, but you know that the Defendant had a warrant." So the Defense has brought the issue of the warrant up.

The State is not looking to get into specifically what the warrant was for, and by that I mean that the specifics of the probation revocation, which was directly related to drugs; however, I think that the State can ask whether or not the trooper knew the basis for the warrant, which was a probation revocation generically, and then whether there were any conditions attached to that. I think it is relevant because at that point I believe it is further relevant to show and ask whether or not, based upon those conditions, Ms. Herrera – because I think it goes to consciousness of guilt, and we're talking about creating reasonable doubt with Mr. Fyffe and the fact that he planted the drugs, and it wasn't Ms. Herrera. I think at that point when the trooper went to the jail and asked for a UA, pursuant to the conditions of the warrant, she observed certain behavior from Ms. Herrera, which prevented the trooper from obtaining that UA. And I think it is relevant to consciousness of guilt for Ms. Herrera.

We did not open the door. I'm not asking questions about prior bad acts, but certainly the fact that there is a warrant, that again, opened the door by the Defendant, certainly has the indication of a bad act, but not specifically what that bad act is, and we would not ask that question. But I think we are entitled to make inquiry. We were very careful.

[¶15] Over a defense objection, the court ruled that the State could ask Trooper Schulmeister about her attempts to obtain a urine sample from Ms. Herrera, provided that no questions were allowed concerning the underlying warrant or the offense to which it

5

related. Trooper Schulmeister then testified as follows concerning her second attempt to obtain the sample:

> A. So she again takes a few minutes, and she, you know, she told me that she was ready this time. And I said so – but I'm standing, now I'm looking, and never saw anybody put her hands in there and trying to put pressure in there, so I'm trying to look. I'm getting even closer to look what she's doing, and I saw her dipping the cup in the water. Then she said, "I have it." And I can see that the toilet water was moving and that the cup was dripping liquid.
>
> Q. So did you seal that specimen up and send it in for testing?
>
> A. No, I told her that was – I saw her dipping and tampering with the urinalysis, that we were done with the games.
>
> Q. Did you make any further attempt to get a urine sample from her?
>
> A. No.

[¶16] The jury found Ms. Herrera guilty on all four counts, and the district court sentenced her to a total prison term of three to five years. Ms. Herrera timely appealed to this Court.

## DISCUSSION

[¶17] Before turning to the merits of Ms. Herrera's Fifth Amendment claim, we address the State's claim that she waived review when she failed to raise her claim below.

## A. Waiver

[¶18] W.R.Cr.P. 12(b)(3) requires that a motion to suppress evidence must be made before trial. We have said:

> W.R.Cr.P. 12(b)(3) requires that a motion to suppress be made before trial, and if a pretrial motion is not made, appellate review is precluded. *Rodriguez v. State*, 2019 WY 25, ¶ 33, 435 P.3d 399, 409 (Wyo. 2019). The only exception to this bar is a showing of good cause for the failure to file the required pretrial motion. *Id.* ¶ 38, 435 P.3d at 411. "If 'the record reveals

6

no impediment to the defendant's ability to have raised the issue prior to appeal,' good cause for failing to raise the issue in a timely manner cannot be found." *Id.* ¶ 40, 435 P.3d at 411 (quoting *United States v. Augustine*, 742 F.3d 1258, 1266 (10th Cir. 2014)); *see also United States v. Baker*, 713 F.3d 558, 561 (10th Cir. 2013) (good cause will be found lacking if record shows that sufficient information was available to defense counsel before trial to enable him to frame suppression argument).

*Bittleston v. State*, 2019 WY 64, ¶ 36, 442 P.3d 1287, 1296 (Wyo. 2019).

[¶19] Ms. Herrera did not file a motion to suppress, but under the circumstances of this case, we find good cause for not doing so. First, Ms. Herrera requested notice of the State's intent to introduce other acts evidence, and the State provided no such notice. As the prosecutor indicated, before defense counsel cross-examined Trooper Schulmeister about the warrant, the State had no intention of delving into the warrant for Ms. Herrera's arrest and the attempts to obtain a urine sample. It is therefore understandable that Ms. Herrera would not have anticipated the need for a motion to suppress, and we therefore find no waiver of her claim.[3]

## B. <u>Standard of Review</u>

[¶20] Ms. Herrera contends that because her Fifth Amendment claim asserts a fundamental error, the standard of review must be de novo and the State bears the burden of proving any error was harmless beyond a reasonable doubt. We disagree.

[¶21] When a claim is raised for the first time on appeal, our review is for plain error, regardless of whether the error asserted is of a fundamental nature. *Lemus v. Martinez*, 2019 WY 52, ¶ 42 n.9, 441 P.3d 831, 840 n.9 (Wyo. 2019) (noting plain error standard applies when appellant demonstrates trial court's actions may have impacted fundamental rights); *Sparks v. State*, 2019 WY 50, ¶ 39, 440 P.3d 1095, 1108 (Wyo. 2019) (citing *Anderson v. State*, 2014 WY 13, ¶ 20, 317 P.3d 1108, 1115 (Wyo. 2014)) (review of

---

[3] It is also not clear that defense counsel could have anticipated his own cross-examination questions about the warrant. That appears to have developed after Trooper Schulmeister testified about her difficulty in determining whether Mr. Fyffe, the adult male passenger, had a warrant for his arrest. She was concerned that he gave her a false first and middle name because when she ran his name, she found an arrest warrant for someone with the same last name, date of birth, and physical description. After much back and forth, she learned that the warrant was for his twin brother, but in the course of her testimony, she indicated that sometimes a person will lie about his name if he knows a warrant has issued for his arrest. Apparently, defense counsel seized on this as an explanation for Ms. Herrera hiding her identity from Trooper Schulmeister and providing false information—as opposed to an alternative explanation that she did not want to be found in the vehicle she owned and in which methamphetamine was located.

constitutional claims is for plain error where appropriate objection not made below). We have said:

> This Court generally does not consider issues raised for the first time on appeal.... "Our rule is that in the absence of fundamental error affecting a substantial right of the appellant an issue raised for the first time on appeal will not be considered." *Davis v. State*, 859 P.2d 89, 94 (Wyo. 1993). We review those claims not objected to at trial and raised for the first time on appeal for plain error.

*Brown v. State*, 2014 WY 104, ¶ 15, 332 P.3d 1168, 1173 (Wyo. 2014) (quoting *Belden v. State*, 2003 WY 89, ¶ 55, 73 P.3d 1041, 1090 (Wyo. 2003)).

[¶22]   In fact, the fundamental nature of an alleged error is not material to our review when the issue raised for the first time on appeal is one that Rule 12(b) requires to be raised before trial.  We have said:

> We . . . do not mean to suggest that whether an issue is fundamental is a Rule 12-required inquiry. It simply is not. The United States Supreme Court has recognized that Rule 12 will operate to effect a waiver even where the defendant alleges "the deprivation of a substantial constitutional right."

*Rodriguez*, ¶ 43 n.10, 435 P.3d at 412 n.10 (quoting *Davis v. United States*, 411 U.S. 233, 243, 93 S.Ct. 1577, 1583, 36 L.Ed.2d 216 (1973)).

[¶23]   Our sole consideration in determining whether to review a Rule 12(b) issue raised for the first time on appeal is whether the defendant has shown good cause for failing to raise the issue below.  If we find good cause, as we did here, our review is for plain error, just as it is for any other issue raised for the first time on appeal.  *See United States v. Lockett*, 859 F.3d 425, 428 (7th Cir. 2017) (quoting *United States v. Acox*, 595 F.3d 729, 731 (7th Cir. 2010)) (review will be for plain error if good cause is shown for absence of pretrial motion.).

[¶24]   To establish plain error, an appellant must show that:

> "(1) the alleged error clearly appears in the record; (2) the alleged error clearly and obviously violates a clear and unequivocal rule of law; and (3) the alleged error affects a substantial right" to his material prejudice. *Cole v. State*, 2017 WY 87, ¶ 9, 399 P.3d 618, 620 (Wyo. 2017); *see also Brown*, ¶ 19, 332 P.3d at 1175. To satisfy the prejudice element of the

plain error standard, a defendant must demonstrate a reasonable probability that he would have obtained a more favorable trial verdict without the error. *Larkins v. State*, 2018 WY 122, ¶ 94, 429 P.3d 28, 50 (Wyo. 2018).

*Nielsen v. State*, 2018 WY 132, ¶ 23, 430 P.3d 740, 748 (Wyo. 2018).

## C.    Merits of Ms. Herrera's Fifth Amendment Claim

[¶25]  Ms. Herrera's Fifth Amendment claim stems from Trooper Schulmeister's attempts to obtain a urine sample from her.  Ms. Herrera does not challenge the trooper's authority to demand the sample, and she does not contend that the sample itself, had one been obtained, would be inadmissible under the Fifth Amendment.  She instead contends that her contamination of the sample communicated her guilty knowledge or consciousness of guilt, and that evidence of the contamination was therefore admitted in violation of her right to remain silent.  We find no support for this claim in the Fifth Amendment.

[¶26]  The United States Supreme Court has described the Fifth Amendment right to remain silent as follows:

> The Self–Incrimination Clause of the Fifth Amendment provides that no "person ... shall be compelled in any criminal case to be a witness against himself." Although the text does not delineate the ways in which a person might be made a "witness against himself," *cf. Schmerber v. California*, 384 U.S. 757, 761-762, n. 6, 86 S.Ct. 1826, 1831, n. 6, 16 L.Ed.2d 908 (1966), we have long held that the privilege does not protect a suspect from being compelled by the State to produce "real or physical evidence." *Id*., at 764, 86 S.Ct., at 1832. Rather, the privilege "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." *Id*., at 761, 86 S.Ct., at 1830. "[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information. Only then is a person compelled to be a 'witness' against himself." *Doe v. United States*, 487 U.S. 201, 210, 108 S.Ct. 2341, 2347, 101 L.Ed.2d 184 (1988).

*Pennsylvania v. Muniz*, 496 U.S. 582, 588-89, 110 S.Ct. 2638, 2643. 110 L.Ed.2d 528 (1990) (footnote omitted); *see also Smith v. State*, 2009 WY 2, ¶ 27, 199 P.3d 1052, 1060 (Wyo. 2009) ("[T]he Fifth Amendment right against self-incrimination, i.e., the right to remain silent, only extends to testimonial or communicative evidence.").

[¶27] The question then is whether Ms. Herrera was compelled to communicate her incriminating thoughts when she was required to provide a urine sample. Answering this question requires two considerations: 1) Was Ms. Herrera's act of contaminating her urine sample a communicative act; and 2) did the government compel Ms. Herrera to contaminate her urine sample? We address them in that order.

1. **Contamination of Sample as Communicative Act**

[¶28] A communicative act may be verbal or nonverbal, but a nonverbal act is testimonial only when it "reflects the actor's communication of his thoughts to another." *Muniz*, 496 U.S. at 595 n.9, 110 S.Ct. at 2647 n.9. The Supreme Court has further explained:

> The word "witness" in the constitutional text limits the relevant category of compelled incriminating communications to those that are "testimonial" in character. As Justice Holmes observed, there is a significant difference between the use of compulsion to extort communications from a defendant and compelling a person to engage in conduct that may be incriminating. Thus, even though the act may provide incriminating evidence, a criminal suspect may be compelled to put on a shirt, to provide a blood sample or handwriting exemplar, or to make a recording of his voice. The act of exhibiting such physical characteristics is not the same as a sworn communication by a witness that relates either express or implied assertions of fact or belief. *Pennsylvania v. Muniz*, 496 U.S. 582, 594-598, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990). Similarly, the fact that incriminating evidence may be the byproduct of obedience to a regulatory requirement, such as filing an income tax return, maintaining required records, or reporting an accident, does not clothe such required conduct with the testimonial privilege.

*United States v. Hubbell*, 530 U.S. 27, 34-35, 120 S.Ct. 2037, 2042-43, 147 L.Ed.2d 24 (2000) (footnotes omitted).

[¶29] In *South Dakota v. Neville*, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983), the Court addressed the question of whether a defendant's Fifth Amendment right to remain silent was violated by the admission of evidence that he exercised his right to refuse a blood alcohol test. In ruling on the question, the Court did not decide whether a refusal is a communicative act and instead rejected the claim on the ground that the government did not compel the defendant to refuse testing. *Neville*, 459 U.S. at 562, 103 S.Ct. at 921-22 ("Since no impermissible coercion is involved when the suspect refuses to submit to take

10

the test, regardless of the form of refusal, we prefer to rest our decision on this ground[.]"). The Court also observed, however, that a majority of courts have found that a refusal to submit to lawful testing is not a communicative act.

> Most courts applying general Fifth Amendment principles to the refusal to take a blood test have found no violation of the privilege against self-incrimination. Many courts, following the lead of Justice Traynor's opinion for the California Supreme Court in *People v. Sudduth*, 65 Cal.2d 543, 55 Cal.Rptr. 393, 421 P.2d 401 (1966), cert. denied, 389 U.S. 850, 88 S.Ct. 43, 19 L.Ed.2d 119 (1967), have reasoned that refusal to submit is a physical act rather than a communication and for this reason is not protected by the privilege. As Justice Traynor explained more fully in the companion case of *People v. Ellis*, 65 Cal.2d 529, 55 Cal.Rptr. 385, 421 P.2d 393 (1966) (refusal to display voice not testimonial), evidence of refusal to take a potentially incriminating test is similar to other circumstantial evidence of consciousness of guilt, such as escape from custody and suppression of evidence. The court below, relying on *Dudley v. State*, 548 S.W.2d 706 (Tex.Cr.App.1977), and *State v. Andrews*, 297 Minn. 260, 212 N.W.2d 863 (1973), cert. denied, 419 U.S. 881, 95 S.Ct. 146, 42 L.Ed.2d 121 (1974), rejected this view. This minority view emphasizes that the refusal is "a tacit or overt expression and communication of defendant's thoughts," *State v. Neville*, 312 N.W.2d, at 726, and that the Constitution "simply forbids any compulsory revealing or communication of an accused person's thoughts or mental processes, whether it is by acts, failure to act, words spoken or failure to speak." *Dudley*, 548 S.W.2d, at 708.
>
> While we find considerable force in the analogies to flight and suppression of evidence suggested by Justice Traynor, we decline to rest our decision on this ground.

*Neville*, 459 U.S. at 560-61, 103 S.Ct. at 921 (footnotes omitted).

[¶30]  We find the majority rule, that an accused's refusal to submit to lawful testing is not a communicative act, to be the better reasoned position.  The Washington Supreme Court offered a particularly persuasive analysis when it rejected an argument that an accused's refusal to perform a field sobriety test (FST) was a communicative act entitled to Fifth Amendment protection.

11

The Court of Appeal in this case acknowledged that the performance of an FST is nontestimonial, but distinguished between a suspect's *performance* of an FST and a suspect's *response* to a question about whether he is willing to take the test. *City of Seattle v. Stalsbroten*, 91 Wash.App. 226, 232, 957 P.2d 260 (1998). According to the court, the question of whether the performance of an FST produces nontestimonial evidence is separate from the question of whether the request to perform an FST produces nontestimonial evidence. *Id*. The court agreed that the performance of an FST is nontestimonial, but concluded that a question about a suspect's willingness to participate in an FST requires a testimonial response. *Id*. According to the court, a suspect's refusal to perform an FST communicates to the officer the suspect's implied belief that he or she thinks he or she will fail the test. *Id*. Given the fact that the refusal communicates a suspect's "perception of intoxication," the court concluded that the refusal to submit to FSTs is testimonial and therefore constitutionally protected. *Id*. at 235, 957 P.2d 260.

We disagree with this distinction. A suspect's refusal to perform an FST is no more testimonial than the suspect's actual performance of an FST. *State v. Hoenscheid*, 374 N.W.2d 128 (S.D.1985). Just because refusal evidence has probative value does not mean that such evidence is testimonial. *See Welch v. District Court of Vt.*, 461 F.Supp. 592, 595 (D.Vt. 1978) (discussing refusal evidence in the context of Breathalyzer tests) *aff'd*, 594 F.2d 903 (2d Cir. 1979). A refusal to submit to sobriety tests is not a statement communicating testimonial evidence; rather, the refusal "is best described as conduct indicating a consciousness of guilt." *Newhouse v. Misterly*, 415 F.2d 514, 518 (9th Cir. 1969) (discussing refusal evidence in the context of blood alcohol tests). The act of refusal "merely exposes [the defendant] to the drawing of inferences, just as does any other act." *State v. Wright*, 116 N.M. 832, 835, 867 P.2d 1214, 1216 (Ct. App. 1993) (quoting *McKay v. Davis*, 99 N.M. 29, 31, 653 P.2d 860, 861 (1982)).

The argument that a refusal to take an FST communicates the suspect's belief that the test will produce evidence of his or her guilt confuses reasonable inferences with communications. *See Welch*, 461 F.Supp. at 595. "Perhaps one might infer from the

refusal that it is an effort to conceal intoxication, but evidence of the refusal and of the words of refusal, standing alone, does not constitute testimonial evidence of any thought, reason or excuse for the refusal." *Id.* (footnote omitted). Because a defendant's refusal to perform an FST is not testimonial evidence, Fifth Amendment protections do not apply.

*City of Seattle v. Stalsbroten*, 978 P.2d 1059, 1062-63 (Wash. 1999).

[¶31]  Ms. Herrera's act of contaminating her urine sample is no different from a refusal to submit to testing.  *See State v. Crawley*, 633 N.W.2d 802, 805 (Iowa 2001) (no difference between refusal to submit handwriting exemplar and attempt to disguise it); *People v. Tai*, 44 Cal. Rptr.2d 253, 258 (Cal. Ct. App. 1995) (same); *State v. Haze*, 542 P.2d 720, 723 (Kan. 1975) (citing *United States v. Stembridge*, 477 F.2d 874 (5th Cir. 1973)) ("no meaningful distinction between the affirmative act of intentionally distorting handwriting and verbally refusing to give an exemplar").  Moreover, courts have recognized that attempts to thwart lawful testing are no more communicative and garner no greater Fifth Amendment protection than the tests themselves or refusals to submit to the testing.

> Just as a defendant's refusal to provide a handwriting exemplar is admissible evidence of consciousness of guilt (*see People v. Clark* (1993) 5 Cal.4th 950, 1003, 22 Cal.Rptr.2d 689, 857 P.2d 1099), so too is opinion evidence of a defendant's efforts to disguise his handwriting on an exemplar. Since a defendant has no privilege to refuse to provide a court-ordered handwriting exemplar, his or her attempts to alter or disguise this physical characteristic is admissible evidence of consciousness of guilt. The Fifth Amendment privilege against self-incrimination is not implicated by the admission of such expert opinion testimony.

*Tai*, 44 Cal. Rptr.2d at 258; *see also United States v. Wolfish*, 525 F.2d 457, 461 (2nd Cir. 1975) (per curiam); *Stembridge*, 477 F.2d at 876.

[¶32]  Ms. Herrera's reliance on *Doe v. United States*, 487 U.S. 201, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1988), to suggest otherwise is misplaced.  In *Doe*, the Court noted an earlier ruling in which it had held that the issuance of a subpoena might implicate Fifth Amendment-protected communications.  *Doe*, 487 U.S. at 208, 108 S.Ct. at 2347.  The Court explained:

> [T]he act of production could constitute protected testimonial communication because it might entail implicit statements of fact: by producing documents in compliance with a subpoena,

13

the witness would admit that the papers existed, were in his possession or control, and were authentic.

*Id.*

[¶33] Ms. Herrera was ordered to provide a urine sample. A urine sample is a physical sample, not a compelled communication of information or thoughts. *Schmerber v. State of California*, 384 U.S. 757, 765, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908 (1966) ("Not even a shadow of testimonial compulsion upon or enforced communication by the accused was involved either in the extraction or in the chemical analysis."). In *Muniz*, the Court reiterated, quoting *Doe*, that the Fifth Amendment's protections extend only to a government's attempts to force an accused to reveal his or her thoughts, not to a government compelling a physical sample.

> ". . . [T]he privilege was not implicated in [the line of cases beginning with *Schmerber*], because the suspect was not required 'to disclose any knowledge he might have,' or 'to speak his guilt.' *Wade*, 388 U.S., at 222-223 [87 S.Ct., at 1929–1930]. *See Dionisio*, 410 U.S., at 7 [93 S.Ct., at 768]; *Gilbert*, 388 U.S., at 266-267 [87 S.Ct., at 1953-1954]. It is the 'extortion of information from the accused,' *Couch v. United States*, 409 U.S., [322] at 328 [93 S.Ct. 611, 616, 34 L.Ed.2d 548] [(1973)] the attempt to force him 'to disclose the contents of his own mind,' *Curcio v. United States*, 354 U.S. 118, 128 [77 S.Ct. 1145, 1151-1152, 1 L.Ed.2d 1225] (1957), that implicates the Self–Incrimination Clause.... 'Unless some attempt is made to secure a communication—written, oral or otherwise—upon which reliance is to be placed as involving [the accused's] consciousness of the facts and the operations of his mind in expressing it, the demand made upon him is not a testimonial one.' 8 Wigmore § 2265, p. 386."

*Muniz*, 496 U.S. at 594-95, 110 S.Ct. at 2646-47 (quoting *Doe*, 487 U.S. at 210-11, 108 S.Ct. at 2348) (alterations in original).

[¶34] We are not persuaded that Ms. Herrera could convert a lawful order to provide a physical sample into a demand for a communication by the physical act of resisting that lawful order. Ms. Herrera's contamination of her urine sample was a physical act from which an inference of guilty knowledge could be drawn. It was not a communicative or testimonial act protected by the Fifth Amendment.

## 2. __Government Coercion__

[¶35] Given our conclusion that Ms. Herrera's contamination of her urine sample was not a communicative act, we could end our discussion at this point on the basis that she has not shown an obvious violation of a clear and unequivocal rule of law. However, because Ms. Herrera has intertwined her coercion and communicative acts arguments, and in the interest of addressing those arguments in their entirety, we will rule on her argument that Ms. Herrera's contamination of her urine sample was a compelled act.

[¶36] Ms. Herrera bases her coercion argument on the Supreme Court's holding in *Neville* that allowing evidence of a defendant's refusal to submit to testing does not violate the privilege against self-incrimination. *Neville*, 459 U.S. at 564, 103 S.Ct. at 923. She argues (emphasis in original):

> In [*Neville*], the Supreme Court held that the state court improperly ruled an implied consent statute which allowed a defendant's refusal to submit to a blood alcohol test to be used as evidence against him violated the privilege against self-incrimination. Although the decision considered South Dakota's implied consent statute, the Supreme Court's decision was not dependent upon the statutory language. Instead, the Supreme Court recognized that protecting the defendant from being *compelled* to testify against himself is the lynchpin of the Fifth Amendment protection. The *Neville* Court noted that the defendant was not compelled as that term is used under the Fifth Amendment because he was given a choice to submit or refuse.

[¶37] This argument misapprehends the *Neville* holding. In *Neville*, the Court held that "a refusal to take a blood-alcohol test, after a police officer has lawfully requested it, is not an act coerced by the officer, and thus is not protected by the privilege against self-incrimination." *Neville*, 459 U.S. at 564, 103 S.Ct. at 923 (footnote omitted). The Court did not condition its holding on an accused being offered a choice to refuse the testing. Instead, it held that the act of offering the choice does not compel a defendant to refuse and the refusal is therefore not protected by the Fifth Amendment.

> [T]he values behind the Fifth Amendment are not hindered when the state offers a suspect the choice of submitting to the blood-alcohol test or having his refusal used against him. The simple blood-alcohol test is so safe, painless, and commonplace, *see Schmerber*, 384 U.S., at 771, 86 S.Ct., at 1836, that respondent concedes, as he must, that the state could legitimately compel the suspect, against his will, to accede to

15

the test. Given, then, that the offer of taking a blood-alcohol test is clearly legitimate, the action becomes no *less* legitimate when the State offers a second option of refusing the test, with the attendant penalties for making that choice. Nor is this a case where the State has subtly coerced respondent into choosing the option it had no right to compel, rather than offering a true choice. To the contrary, the State wants respondent to choose to take the test, for the inference of intoxication arising from a positive blood-alcohol test is far stronger than that arising from a refusal to take the test.

We recognize, of course, that the choice to submit or refuse to take a blood alcohol test will not be an easy or pleasant one for a suspect to make. But the criminal process often requires suspects and defendants to make difficult choices. *See*, *e.g.*, *Crampton v. Ohio*, decided with *McGautha v. California*, 402 U.S. 183, 213–217, 91 S.Ct. 1454, 1470–1472, 28 L.Ed.2d 711 (1971).

*Neville*, 459 U.S. at 563-64, 103 S.Ct. at 922-23.

[¶38]  The Court's reasoning and holding in *Neville* were dependent not on the accused being offered an opportunity to refuse testing, but on ensuring the government did not compel the accused to make the choice of refusing.  In short, the Supreme Court found no violation because South Dakota did not compel Neville to refuse testing.

[¶39]  That this was the Court's reasoning is illustrated by our application of *Neville* in *Smith*.  In *Smith*, the defendant was suspected in the murder of a woman, and investigators requested that he submit to DNA testing.  *Smith*, ¶ 5, 199 P.3d at 1056.  He refused, and the officers obtained a warrant and took samples for testing.  *Id*.  After his conviction, he appealed and claimed that his Fifth Amendment right to remain silent was violated when evidence of his refusal to consent to the DNA testing was admitted at trial.  *Id*. ¶ 25, 199 P.3d at 1059.  We rejected his claim.  Applying *Neville*, we held that because the defendant had not been compelled to refuse consent, the evidence of his refusal was not protected by the Fifth Amendment.  *Id*. ¶¶ 28-29, 32, 199 P.3d at 1060-61.

Here, the investigators asked Mr. Smith to voluntarily give a DNA sample; after he refused, they obtained a warrant to obtain the sample. The DNA sample and the associated test results were not testimonial or communicative evidence and the State could compel him to provide the sample. By giving him the choice of providing a sample or refusing, the State did not coerce him and the evidence of his refusal did not fall

16

within the Fifth Amendment protection. We conclude, therefore, the prosecutor did not violate Mr. Smith's privilege against self-incrimination or commit prosecutorial misconduct by eliciting testimony about, or commenting upon, his refusal to voluntarily provide a sample for DNA testing.

*Smith*, ¶ 32, 199 P.3d at 1061 (footnote omitted).[4]

[¶40] Unlike the defendant in *Neville*, Smith did not have a choice with regard to providing a sample. When he did not consent, the sample was compelled by a warrant. It is clear that the choice the Supreme Court focused on in *Neville*, and that this Court focused on in *Smith*, was the defendant's choice to refuse. Neither court looked to whether the sample was coerced. Instead both looked to whether the choice to refuse was coerced, and each found that the defendant had freely made the choice to refuse. That being the case, the refusal was not compelled, and the Fifth Amendment was not implicated.

[¶41] In this case, Trooper Schulmeister compelled Ms. Herrera to provide a urine sample. She did not compel her to contaminate the urine sample. Ms. Herrera made that choice, and her actions are not protected by the Fifth Amendment.

## CONCLUSION

[¶42] Ms. Herrera had good cause for failing to raise her Fifth Amendment claim before trial, so the claim is not waived and our review is for plain error. Ms. Herrera was lawfully compelled to provide a urine sample, and her decision to contaminate her sample was neither a communicative act nor an act compelled by the State. Evidence of her actions was therefore not protected by the Fifth Amendment, and we find no plain error in the admission of the evidence. Affirmed.

---

[4] The Court observed that the use of the defendant's refusal to consent to the DNA sample likely ran afoul of the Fourth Amendment, but it found that the issue was waived because it was not raised before the trial court or on appeal. *Smith*, ¶ 32, 199 P.3d at 1061 n.1. The Court also noted, however, that such error would have been harmless in light of the other evidence against the defendant.